# WATSON *v.* FORT WORTH BANK & TRUST

No. 86–6139.   Argued January 20, 1988—Decided June 29, 1988

978

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, and III, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and SCALIA, JJ., joined, and an opinion with respect to Parts II–C and II–D in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 1000. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 1011. KENNEDY, J., took no part in the consideration or decision of the case.

*Art Brender* argued the cause and filed briefs for petitioner. *Bruce W. McGee* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *Jim Mattox*, Attorney General, *Mary F. Keller*, Executive Assistant Attorney General, and *James C. Todd;* for the American Civil Liberties Union et al. by *Deborah A. Ellis, Isabelle Katz Pinzler*, and *Joan E. Bertin;* for the American Psychological Association by *Donald N. Bersoff;* for the Lawyers' Committee for Civil Rights Under Law by *John Townsend Rich, Conrad K. Harper, Stuart J. Land, Norman Redlich, William L. Robinson, Judith A. Winston*, and *Richard T. Seymour;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Bill Lann Lee, Stephen M. Cutler, Joan M. Graff, Patricia A. Shiu, Julius LeVonne Chambers, Ronald L. Ellis, Charles Stephen Ralston, Antonia Hernandez*, and *E. Richard Larson.*

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Solicitor General Ayer, Deputy Assistant Attorney General Clegg, David K. Flynn*, and *Charles A. Shanor;* for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell, Edward E. Potter*, and *Garen E. Dodge;* for the American Society for Personnel Administration et al. by *Lawrence Z. Lorber* and *J. Robert Kirk;* for the Landmark Legal Foundation by *Jerald L. Hill* and *Mark J. Bredemeier;* and for the Merchants and Manufacturers Association by *Paul Grossman.*

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A, II–B, and III, and an opinion with respect to parts II–C and II–D, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join.

This case requires us to decide what evidentiary standards should be applied under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e et seq., in determining whether an employer's practice of committing promotion decisions to the subjective discretion of supervisory employees has led to illegal discrimination.

## I

Petitioner Clara Watson, who is black, was hired by respondent Fort Worth Bank and Trust (the Bank) as a proof operator in August 1973. In January 1976, Watson was promoted to a position as teller in the Bank's drive-in facility. In February 1980, she sought to become supervisor of the tellers in the main lobby; a white male, however, was selected for this job. Watson then sought a position as supervisor of the drive-in bank, but this position was given to a white female. In February 1981, after Watson had served for about a year as a commercial teller in the Bank's main lobby, and informally as assistant to the supervisor of tellers, the man holding that position was promoted. Watson applied for the vacancy, but the white female who was the supervisor of the drive-in bank was selected instead. Watson then applied for the vacancy created at the drive-in; a white male was selected for that job. The Bank, which has about 80 employees, had not developed precise and formal criteria for evaluating candidates for the positions for which Watson unsuccessfully applied. It relied instead on the subjective judgment of supervisors who were acquainted with the candidates and with the nature of the jobs to be filled. All the supervisors involved in denying Watson the four promotions at issue were white.

Watson filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). After exhausting her administrative remedies, she filed this lawsuit in the United States District Court for the Northern District of Texas. She alleged that the Bank had unlawfully discriminated against blacks in hiring, compensation, initial placement, promotions, terminations, and other terms and conditions of employment. On Watson's motion under Federal Rule of Civil Procedure 23, the District Court certified a class consisting of "blacks who applied to or were employed by [respondent] on or after October 21, 1979 or who may submit employment applications to [respondent] in the future." App. 190. The District Court later decertified this broad class because it concluded, in light of the evidence presented at trial, that there was not a common question of law or fact uniting the groups of applicants and employees. After splitting the class along this line, the court found that the class of black employees did not meet the numerosity requirement of Rule 23(a); accordingly, this subclass was decertified. The court also concluded that Watson was not an adequate representative of the applicant class because her promotion claims were not typical of the claims of the members of that group. Because Watson had proceeded zealously on behalf of the job applicants, however, the court went on to address the merits of their claims. It concluded that Watson had failed to establish a prima facie case of racial discrimination in hiring: the percentage of blacks in the Bank's work force approximated the percentage of blacks in the metropolitan area where the Bank is located. App. 199–202.

The District Court addressed Watson's individual claims under the evidentiary standards that apply in a discriminatory treatment case. See *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), and *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248 (1981). It concluded, on the evidence presented at trial, that Watson had established a prima facie case of employment discrimination, but that the

Bank had met its rebuttal burden by presenting legitimate and nondiscriminatory reasons for each of the challenged promotion decisions. The court also concluded that Watson had failed to show that these reasons were pretexts for racial discrimination. Accordingly, the action was dismissed. App. 195–197, 203.

A divided panel of the United States Court of Appeals for the Fifth Circuit affirmed in part. 798 F. 2d 791 (1986). The majority concluded that there was no abuse of discretion in the District Court's class decertification decisions. In order to avoid unfair prejudice to members of the class of black job applicants, however, the Court of Appeals vacated the portion of the judgment affecting them and remanded with instructions to dismiss those claims without prejudice. The majority affirmed the District Court's conclusion that Watson had failed to prove her claim of racial discrimination under the standards set out in *McDonnell Douglas, supra,* and *Burdine, supra.*[1]

Watson argued that the District Court had erred in failing to apply "disparate impact" analysis to her claims of discrimination in promotion. Relying on Fifth Circuit precedent, the majority of the Court of Appeals panel held that "a Title VII challenge to an allegedly discretionary promotion system is properly analyzed under the disparate treatment model rather than the disparate impact model." 798 F. 2d, at 797. Other Courts of Appeals have held that disparate impact analysis may be applied to hiring or promotion systems that involve the use of "discretionary" or "subjective" criteria. See, *e. g., Atonio* v. *Wards Cove Packing Co.,* 810 F. 2d 1477 (CA9) (en banc), on return to panel, 827 F. 2d

---

[1] The dissenting judge argued that the District Court had abused its discretion in decertifying the broad class of black employees and applicants. He also argued that Watson had succeeded in proving that the Bank had discriminated against this class, and that the case should be remanded so that appropriate relief could be ordered. 798 F. 2d, at 800–815.

439. (1987), cert denied, No. 87–1388, 485 U. S. 989 (1988), cert. pending, No. 87–1387; *Griffin* v. *Carlin*, 755 F. 2d 1516, 1522–1525 (CA11 1985). Cf. *Segar* v. *Smith*, 238 U. S. App. D. C. 103, 738 F. 2d 1249 (1984), cert. denied, 471 U. S. 1115 (1985). We granted certiorari to resolve the conflict. 483 U. S. 1004 (1987).

## II

## A

Section 703 of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–2, provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

.    .    .    .    .

"(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer . . . to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. . . ."

Several of our decisions have dealt with the evidentiary standards that apply when an individual alleges that an employer has treated that particular person less favorably than

others because of the plaintiff's race, color, religion, sex, or national origin. In such "disparate treatment" cases, which involve "the most easily understood type of discrimination," *Teamsters* v. *United States*, 431 U. S. 324, 335, n. 15 (1977), the plaintiff is required to prove that the defendant had a discriminatory intent or motive. In order to facilitate the orderly consideration of relevant evidence, we have devised a series of shifting evidentiary burdens that are "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S., at 255, n. 8. Under that scheme, a prima facie case is ordinarily established by proof that the employer, after having rejected the plaintiff's application for a job or promotion, continued to seek applicants with qualifications similar to the plaintiff's. *Id.*, at 253, and n. 6. The burden of proving a prima facie case is "not onerous," *id.*, at 253, and the employer in turn may rebut it simply by producing some evidence that it had legitimate, nondiscriminatory reasons for the decision. *Id.*, at 254–255. If the defendant carries this burden of production, the plaintiff must prove by a preponderance of all the evidence in the case that the legitimate reasons offered by the defendant were a pretext for discrimination. *Id.*, at 253, 255, n. 10. We have cautioned that these shifting burdens are meant only to aid courts and litigants in arranging the presentation of evidence: "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*, at 253. See also *United States Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 715 (1983).

In *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), this Court held that a plaintiff need not necessarily prove intentional discrimination in order to establish that an employer has violated § 703. In certain cases, facially neutral employment practices that have significant adverse effects on protected *groups* have been held to violate the Act without proof

that the employer adopted those practices with a discriminatory intent. The factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination. See *Burdine, supra*, at 252, n. 5; see also *United States Postal Service Bd. of Governors* v. *Aikens, supra*, at 713, n. 1; *McDonnell Douglas*, 411 U. S., at 802, n. 14; *Teamsters, supra*, at 335–336, n. 15. The evidence in these "disparate impact" cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.

The distinguishing features of the factual issues that typically dominate in disparate impact cases do not imply that the ultimate legal issue is different than in cases where disparate treatment analysis is used. See, *e. g.*, *Washington* v. *Davis*, 426 U. S. 229, 253–254 (1976) (STEVENS, J., concurring). Nor do we think it is appropriate to hold a defendant liable for unintentional discrimination on the basis of less evidence than is required to prove intentional discrimination. Rather, the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.

Perhaps the most obvious examples of such functional equivalence have been found where facially neutral job requirements necessarily operated to perpetuate the effects of intentional discrimination that occurred before Title VII was enacted. In *Griggs* itself, for example, the employer had a history of overt racial discrimination that predated the enactment of the Civil Rights Act of 1964. 401 U. S., at 426–428. Such conduct had apparently ceased thereafter, but the employer continued to follow employment policies that had "a markedly disproportionate" adverse effect on blacks. *Id.*, at 428–429. Cf. *Teamsters, supra*, at 349, and n. 32. The *Griggs* Court found that these policies, which involved the use of general aptitude tests and a high school di-

ploma requirement, were not demonstrably related to the jobs for which they were used. 401 U. S., at 431–432. Believing that diplomas and tests could become "masters of reality," *id.*, at 433, which would perpetuate the effects of pre-Act discrimination, the Court concluded that such practices could not be defended simply on the basis of their facial neutrality or on the basis of the employer's lack of discriminatory intent.

This Court has repeatedly reaffirmed the principle that some facially neutral employment practices may violate Title VII even in the absence of a demonstrated discriminatory intent. We have not limited this principle to cases in which the challenged practice served to perpetuate the effects of pre-Act intentional discrimination. Each of our subsequent decisions, however, like *Griggs* itself, involved standardized employment tests or criteria. See, *e. g., Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975) (written aptitude tests); *Washington* v. *Davis, supra* (written test of verbal skills); *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977) (height and weight requirements); *New York City Transit Authority* v. *Beazer*, 440 U. S. 568 (1979) (rule against employing drug addicts); *Connecticut* v. *Teal*, 457 U. S. 440 (1982) (written examination). In contrast, we have consistently used conventional disparate treatment theory, in which proof of intent to discriminate is required, to review hiring and promotion decisions that were based on the exercise of personal judgment or the application of inherently subjective criteria. See, *e. g., McDonnell Douglas Corp.* v. *Green, supra* (discretionary decision not to rehire individual who engaged in criminal acts against employer while laid off); *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567 (1978) (hiring decisions based on personal knowledge of candidates and recommendations); *Texas Dept. of Community Affairs* v. *Burdine, supra* (discretionary decision to fire individual who was said not to get along with co-workers); *United States Postal Serv-*

*ice Bd. of Governors* v. *Aikens,* 460 U. S., at 715 (discretionary promotion decision).

Our decisions have not addressed the question whether disparate impact analysis may be applied to cases in which subjective criteria are used to make employment decisions. As noted above, the Courts of Appeals are in conflict on the issue. In order to resolve this conflict, we must determine whether the reasons that support the use of disparate impact analysis apply to subjective employment practices, and whether such analysis can be applied in this new context under workable evidentiary standards.

## B

The parties present us with stark and uninviting alternatives. Petitioner contends that subjective selection methods are at least as likely to have discriminatory effects as are the kind of objective tests at issue in *Griggs* and our other disparate impact cases. Furthermore, she argues, if disparate impact analysis is confined to objective tests, employers will be able to substitute subjective criteria having substantially identical effects, and *Griggs* will become a dead letter. Respondent and the United States (appearing as *amicus curiae*) argue that conventional disparate treatment analysis is adequate to accomplish Congress' purpose in enacting Title VII. They also argue that subjective selection practices would be so impossibly difficult to defend under disparate impact analysis that employers would be forced to adopt numerical quotas in order to avoid liability.

We are persuaded that our decisions in *Griggs* and succeeding cases could largely be nullified if disparate impact analysis were applied only to standardized selection practices. However one might distinguish "subjective" from "objective" criteria, it is apparent that selection systems that combine both types would generally have to be considered subjective in nature. Thus, for example, if the employer in *Griggs* had consistently preferred applicants who had a high school di-

ploma and who passed the company's general aptitude test, its selection system could nonetheless have been considered "subjective" if it also included brief interviews with the candidates. So long as an employer refrained from making standardized criteria absolutely determinative, it would remain free to give such tests almost as much weight as it chose without risking a disparate impact challenge. If we announced a rule that allowed employers so easily to insulate themselves from liability under *Griggs*, disparate impact analysis might effectively be abolished.

We are also persuaded that disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices. It is true, to be sure, that an employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct. Especially in relatively small businesses like respondent's, it may be customary and quite reasonable simply to delegate employment decisions to those employees who are most familiar with the jobs to be filled and with the candidates for those jobs. It does not follow, however, that the particular supervisors to whom this discretion is delegated always act without discriminatory intent. Furthermore, even if one assumed that any such discrimination can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain. In this case, for example, petitioner was apparently told at one point that the teller position was a big responsibility with "a lot of money . . . for blacks to have to count." App. 7. Such remarks may not prove discriminatory intent, but they do suggest a lingering form of the problem that Title VII was enacted to combat. If an employer's undisciplined system of subjective decisionmaking has precisely the same effects as

a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. In both circumstances, the employer's practices may be said to "adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a)(2). We conclude, accordingly, that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.

C

Having decided that disparate impact analysis may in principle be applied to subjective as well as to objective practices, we turn to the evidentiary standards that should apply in such cases. It is here that the concerns raised by respondent have their greatest force. Respondent contends that a plaintiff may establish a prima facie case of disparate impact through the use of bare statistics, and that the defendant can rebut this statistical showing only by justifying the challenged practice in terms of "business necessity," *Griggs*, 401 U. S., at 431, or "job relatedness," *Albemarle Paper Co.*, 422 U. S., at 426. Standardized tests and criteria, like those at issue in our previous disparate impact cases, can often be justified through formal "validation studies," which seek to determine whether discrete selection criteria predict actual on-the-job performance. See generally *id.*, at 429–436. Respondent warns, however, that "validating" subjective selection criteria in this way is impracticable. Some qualities — for example, common sense, good judgment, originality, ambition, loyalty, and tact — cannot be measured accurately through standardized testing techniques. Moreover, success at many jobs in which such qualities are crucial cannot itself be measured directly. Opinions often differ when managers and supervisors are evaluated, and the same can be said for many jobs that involve close cooperation with one's co-workers or complex and subtle tasks like the provision of

professional services or personal counseling. Because of these difficulties, we are told, employers will find it impossible to eliminate subjective selection criteria and impossibly expensive to defend such practices in litigation. Respondent insists, and the United States agrees, that employers' only alternative will be to adopt surreptitious quota systems in order to ensure that no plaintiff can establish a statistical prima facie case.

We agree that the inevitable focus on statistics in disparate impact cases could put undue pressure on employers to adopt inappropriate prophylactic measures. It is completely unrealistic to assume that unlawful discrimination is the sole cause of people failing to gravitate to jobs and employers in accord with the laws of chance. See *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 489 (1986) (O'CONNOR, J., concurring in part and dissenting in part). It would be equally unrealistic to suppose that employers can eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces. Congress has specifically provided that employers are *not* required to avoid "disparate impact" as such:

> "Nothing contained in [Title VII] shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer . . . in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." 42 U. S. C. § 2000e–2(j).

Preferential treatment and the use of quotas by public employers subject to Title VII can violate the Constitution, see, e. g., *Wygant* v. *Jackson Bd. of Education*, 476 U. S. 267 (1986), and it has long been recognized that legal rules leaving any class of employers with "little choice" but to adopt such measures would be "far from the intent of Title VII." *Albemarle Paper Co., supra,* at 449 (BLACKMUN, J., concurring in judgment). Respondent and the United States are thus correct when they argue that extending disparate impact analysis to subjective employment practices has the potential to create a Hobson's choice for employers and thus to lead in practice to perverse results. If quotas and preferential treatment become the only cost-effective means of avoiding expensive litigation and potentially catastrophic liability, such measures will be widely adopted. The prudent employer will be careful to ensure that its programs are discussed in euphemistic terms, but will be equally careful to ensure that the quotas are met. Allowing the evolution of disparate impact analysis to lead to this result would be contrary to Congress' clearly expressed intent, and it should not be the effect of our decision today.

## D

We do not believe that disparate impact theory need have any chilling effect on legitimate business practices. We recognize, however, that today's extension of that theory into the context of subjective selection practices could increase the risk that employers will be given incentives to adopt quotas or to engage in preferential treatment. Because Congress has so clearly and emphatically expressed its intent that Title VII not lead to this result, 42 U. S. C. § 2000e–2(j), we think it imperative to explain in some detail why the evidentiary standards that apply in these cases should serve as adequate safeguards against the danger that Congress recog-

nized. Our previous decisions offer guidance, but today's extension of disparate impact analysis calls for a fresh and somewhat closer examination of the constraints that operate to keep that analysis within its proper bounds.[2]

First, we note that the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged. Although this has been relatively easy to do in challenges to standardized tests, it may sometimes be more difficult when subjective selection criteria are at issue. Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities. Cf. *Connecticut* v. *Teal*, 457 U. S. 440 (1982).

Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never

---

[2] Both concurrences agree that we should, for the first time, approve the use of disparate impact analysis in evaluating subjective selection practices. Unlike JUSTICE STEVENS, we believe that this step requires us to provide the lower courts with appropriate evidentiary guidelines, as we have previously done for disparate treatment cases. Moreover, we do not believe that each verbal formulation used in prior opinions to describe the evidentiary standards in disparate impact cases is automatically applicable in light of today's decision. Cf. *post*, at 1000–1001, 1005–1006 (BLACKMUN, J., concurring in part and concurring in judgment). Congress expressly provided that Title VII not be read to require preferential treatment or numerical quotas. 42 U. S. C. § 2000e–2(j). This congressional mandate requires in our view that a decision to extend the reach of disparate impact theory be accompanied by safeguards against the result that Congress clearly said it did not intend.

been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation. In *Griggs*, for example, we examined "requirements [that] operate[d] to disqualify Negroes at a substantially higher rate than white applicants." 401 U. S., at 426. Similarly, we said in *Albemarle Paper Co.* that plaintiffs are required to show "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." 422 U. S., at 425. Later cases have framed the test in similar terms. See, e. g., *Washington* v. *Davis,* 426 U. S., at 246–247 ("hiring and promotion practices disqualifying substantially disproportionate numbers of blacks"); *Dothard,* 433 U. S., at 329 (employment standards that "select applicants for hire in a significantly discriminatory pattern"); *Beazer,* 440 U. S., at 584 ("statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities"); *Teal, supra,* at 446 ("significantly discriminatory impact").[3]

---

[3] Faced with the task of applying these general statements to particular cases, the lower courts have sometimes looked for more specific direction in the EEOC's Uniform Guidelines on Employee Selection Procedures, 29 CFR pt. 1607 (1987). See, e. g., *Bushey* v. *New York State Civil Service Comm'n,* 733 F. 2d 220, 225–226 (CA2 1984), cert. denied, 469 U. S. 1117 (1985); *Firefighters Institute* v. *St. Louis,* 616 F. 2d 350, 356–357 (CA8 1980), cert. denied sub nom. *St. Louis* v. *United States,* 452 U. S. 938 (1981). These Guidelines have adopted an enforcement rule under which adverse impact will not ordinarily be inferred unless the members of a particular race, sex, or ethnic group are selected at a rate that is less than four-fifths of the rate at which the group with the highest rate is selected. 29 CFR § 1607.4(D) (1987). This enforcement standard has been criticized on technical grounds, see, e. g., Boardman & Vining, The Role of Probative Statistics in Employment Discrimination Cases, 46 Law & Contemp. Prob., No. 4, pp. 189, 205–207 (1983); Shoben, Differential Pass-Fail Rates in Employment Testing: Statistical Proof Under Title VII, 91 Harv. L. Rev. 793, 805–811 (1978), and it has not provided more than a rule of thumb

Nor are courts or defendants obliged to assume that plaintiffs' statistical evidence is reliable. "If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own." *Dothard*, 433 U. S., at 331. See also *id.*, at 338–339 (REHNQUIST, J., concurring in result and concurring in part) ("If the defendants in a Title VII suit believe there to be any reason to discredit plaintiffs' statistics that does not appear on their face, the opportunity to challenge them is available to the defendants just as in any other lawsuit. They may endeavor to impeach the reliability of the statistical evidence, they may offer rebutting evidence, or they may disparage in arguments or in briefs the probative weight which the plaintiffs' evidence should be accorded"). Without attempting to catalog all the weaknesses that may be found in such evidence, we may note that typical examples include small or incomplete

---

for the courts, see, *e. g.*, *Clady* v. *County of Los Angeles*, 770 F. 2d 1421, 1428–1429 (CA9 1985), cert. denied, 475 U. S. 1109 (1986).

Courts have also referred to the "standard deviation" analysis sometimes used in jury-selection cases. See, *e. g.*, *Rivera* v. *Wichita Falls*, 665 F. 2d 531, 536, n. 7 (CA5 1982) (citing *Casteneda* v. *Partida*, 430 U. S. 482 (1977)); *Guardians Association of New York City Police Dept. v. Civil Service Comm'n of New York*, 630 F. 2d 79, 86, and n. 4 (CA2 1980) (same), cert. denied, 452 U. S. 940 (1981). We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of "standard deviations" can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination. See *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 311, n. 17 (1977).

Nor has a consensus developed around any alternative mathematical standard. Instead, courts appear generally to have judged the "significance" or "substantiality" of numerical disparities on a case-by-case basis. See *Clady, supra*, at 1428–1429; B. Schlei & P. Grossman, Employment Discrimination Law 98–99, and n. 77 (2d ed. 1983); *id.*, at 18–19, and n. 33 (Supp. 1983–1985). At least at this stage of the law's development, we believe that such a case-by-case approach properly reflects our recognition that statistics "come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances." *Teamsters* v. *United States*, 431 U. S. 324, 340 (1977).

data sets and inadequate statistical techniques. See, *e. g.*, *Fudge* v. *Providence Fire Dept.*, 766 F. 2d 650, 656–659 (CA1 1985). Similarly, statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value. See, *e. g.*, *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 308 (1977) ("[P]roper comparison was between the racial composition of [the employer's] teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market") (footnote omitted). Other kinds of deficiencies in facially plausible statistical evidence may emerge from the facts of particular cases. See, *e. g.*, *Carroll* v. *Sears, Roebuck & Co.*, 708 F. 2d 183, 189 (CA5 1983) ("The flaw in the plaintiffs' proof was its failure to establish the required causal connection between the challenged employment practice (testing) and discrimination in the work force. Because the test does not have a cut-off and is only one of many factors in decisions to hire or promote, the fact that blacks score lower does not automatically result in disqualification of disproportionate numbers of blacks as in cases involving cutoffs") (citation omitted); *Contreras* v. *Los Angeles*, 656 F. 2d 1267, 1273–1274 (CA9 1981) (probative value of statistics impeached by evidence that plaintiffs failed a written examination at a disproportionately high rate because they did not study seriously for it), cert. denied, 455 U. S. 1021 (1982).

A second constraint on the application of disparate impact theory lies in the nature of the "business necessity" or "job relatedness" defense. Although we have said that an employer has "the burden of showing that any given requirement must have a manifest relationship to the employment in question," *Griggs*, 401 U. S., at 432, such a formulation should not be interpreted as implying that the ultimate burden of proof can be shifted to the defendant. On the contrary, the ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times.

Thus, when a plaintiff has made out a prima facie case of disparate impact, and when the defendant has met its burden of producing evidence that its employment practices are based on legitimate business reasons, the plaintiff must "show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." *Albemarle Paper Co.*, 422 U. S., at 425 (citation omitted; internal quotation marks omitted). Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals. The same factors would also be relevant in determining whether the challenged practice has operated as the functional equivalent of a pretext for discriminatory treatment. Cf. *ibid.*

Our cases make it clear that employers are not required, even when defending standardized or objective tests, to introduce formal "validation studies" showing that particular criteria predict actual on-the-job performance. In *Beazer*, for example, the Court considered it obvious that "legitimate employment goals of safety and efficiency" permitted the exclusion of methadone users from employment with the New York City Transit Authority; the Court indicated that the "manifest relationship" test was satisfied even with respect to non-safety-sensitive jobs because those legitimate goals were "significantly served by" the exclusionary rule at issue in that case even though the rule was not required by those goals. 440 U. S., at 587, n. 31. Similarly, in *Washington* v. *Davis*, the Court held that the "job relatedness" requirement was satisfied when the employer demonstrated that a written test was related to success at a police training academy "wholly aside from [the test's] possible relationship to actual performance as a police officer." 426 U. S., at 250. See also *id.*, at 256 (STEVENS, J., concurring) ("[A]s a matter of law, it is permissible for the police department to use a test

for the purpose of predicting ability to master a training program even if the test does not otherwise predict ability to perform on the job").

In the context of subjective or discretionary employment decisions, the employer will often find it easier than in the case of standardized tests to produce evidence of a "manifest relationship to the employment in question." It is self-evident that many jobs, for example those involving managerial responsibilities, require personal qualities that have never been considered amenable to standardized testing. In evaluating claims that discretionary employment practices are insufficiently related to legitimate business purposes, it must be borne in mind that "[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." *Furnco Construction Corp.* v. *Waters,* 438 U. S., at 578. See also *Zahorik* v. *Cornell University,* 729 F. 2d 85, 96 (CA2 1984) ("[The] criteria [used by a university to award tenure], however difficult to apply and however much disagreement they generate in particular cases, are job related. . . . It would be a most radical interpretation of Title VII for a court to enjoin use of an historically settled process and plainly relevant criteria largely because they lead to decisions which are difficult for a court to review"). In sum, the high standards of proof in disparate impact cases are sufficient in our view to avoid giving employers incentives to modify any normal and legitimate practices by introducing quotas or preferential treatment.

### III

We granted certiorari to determine whether the court below properly held disparate impact analysis inapplicable to a subjective or discretionary promotion system, and we now hold that such analysis may be applied. We express no opinion as to the other rulings of the Court of Appeals.

Neither the District Court nor the Court of Appeals has evaluated the statistical evidence to determine whether peti-

tioner made out a prima facie case of discriminatory promotion practices under disparate impact theory. It may be that the relevant data base is too small to permit any meaningful statistical analysis, but we leave the Court of Appeals to decide in the first instance, on the basis of the record and the principles announced today, whether this case can be resolved without further proceedings in the District Court. The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and concurring in the judgment.

I agree that disparate-impact analysis may be applied to claims of discrimination caused by subjective or discretionary selection processes, and I therefore join Parts I, II–A, II–B, and III of the Court's opinion. I am concerned, however, that the plurality mischaracterizes the nature of the burdens this Court has allocated for proving and rebutting disparate-impact claims. In so doing, the plurality projects an application of disparate-impact analysis to subjective employment practices that I find to be inconsistent with the proper evidentiary standards and with the central purpose of Title VII. I therefore cannot join Parts II–C and II–D. I write separately to reiterate what I thought our prior cases had made plain about the nature of claims brought within the disparate-impact framework.

I

The plurality's discussion of the allocation of burdens of proof and production that apply in litigating a disparate-impact claim under Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, is flatly

contradicted by our cases.[1]   The plurality, of course, is correct that the initial burden of proof is borne by the plaintiff, who must establish, by some form of numerical showing, that a facially neutral hiring practice "select[s] applicants . . . in a significantly discriminatory pattern." *Dothard* v. *Rawlinson,* 433 U. S. 321, 329 (1977).[2]   Our cases make clear, however, that, contrary to the plurality's assertion, *ante,* at 997, a plaintiff who successfully establishes this prima facie case shifts the burden of *proof,* not production, to the defendant to establish that the employment practice in question is a business necessity.   See, *e. g., Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975) (employer must "meet the burden of *proving* that its tests are 'job related'"); *Dothard* v. *Rawlinson,* 433 U. S., at 329 (employer must *"prov[e]* that the challenged requirements are job related"); *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 432 (1971) ("Congress has placed on the employer the burden of *showing* that any given requirement must have a manifest relationship to the employment in question") (emphasis added in each quotation).

The plurality's suggested allocation of burdens bears a closer resemblance to the allocation of burdens we established for disparate-treatment claims in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802–804 (1973), and *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248, 252–256 (1981), than it does to those the Court has established for disparate-impact claims.   Nothing in our cases supports the plurality's declaration that, in the context of a disparate-*impact* challenge, "the ultimate burden of prov-

---

[1] It bears noting that the question on which we granted certiorari, and the question presented in petitioner's brief, is whether disparate-impact analysis applies to subjective practices, not where the burdens fall, if the analysis applies.   The plurality need not have reached its discussion of burden allocation and evidentiary standards to resolve the question presented.   I, however, find it necessary to reach this issue in order to respond to remarks made by the plurality.

[2] I have no quarrel with the plurality's characterization of the plaintiff's burden of establishing that any disparity is significant.   See *ante,* at 994–997.

ing that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times." *Ante*, at 997. What is most striking about this statement is that it is a near-perfect echo of this Court's declaration in *Burdine* that, in the context of an individual disparate-*treatment* claim, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 450 U. S., at 253. In attempting to mimic the allocation of burdens the Court has established in the very different context of individual disparate-treatment claims, the plurality turns a blind eye to the crucial distinctions between the two forms of claims.[3]

The violation alleged in a disparate-treatment challenge focuses exclusively on the intent of the employer. See *Teamsters* v. *United States*, 431 U. S. 324, 335, n. 15 (1977) (in disparate-treatment challenge "[p]roof of discriminatory motive is critical"). Unless it is proved that an employer intended to disfavor the plaintiff because of his membership in a protected class, a disparate-treatment claim fails. A disparate-impact claim, in contrast, focuses on the *effect* of the employment practice. See *id.*, at 336, n. 15 (disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another"). Unless an employment practice producing the disparate effect is justified by "business necessity," *ibid.*, it violates Title VII, for "good intent or absence of discriminatory intent does not re-

---

[3] See *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S. 248, 252, n. 5 (1981) (recognizing, in the context of articulating allocation of burdens applicable to disparate-treatment claims, that "the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes"); *United States Postal Service Bd. of Governors* v. *Aikens*, 460 U. S. 711, 713, n. 1 (1983) ("We have consistently distinguished disparate-treatment cases from cases involving facially neutral employment standards that have disparate impact on minority applicants").

deem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups." *Griggs* v. *Duke Power Co.*, 401 U. S., at 432.

In *McDonnell Douglas* and *Burdine*, this Court formulated a scheme of burden allocation designed "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S., at 255, n. 8. The plaintiff's initial burden of establishing a prima facie case of disparate treatment is "not onerous," *id.*, at 253, and "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp.* v. *Waters*, 438 U. S. 567, 577 (1978).[4] An employer may rebut this presumption if it asserts that plaintiff's rejection was based on "a legitimate, nondiscriminatory reason" and produces evidence sufficient to "rais[e] a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dept. of Community Affairs* v. *Burdine*, 450 U. S., at 254–255. If the employer satisfies "this burden of production," then "the factual inquiry proceeds to a new level of specificity," *id.*, at 255, and it is up to the plaintiff to prove that the proffered reason was a pretext for discrimination. *Id.*, at 256. This allocation of burdens reflects the Court's unwillingness to *require* a trial court to presume, on the basis of the facts establishing a prima facie case, that an employer intended to discriminate, in the face of evidence suggesting that the plaintiff's rejection might have been justified by

---

[4] In *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 802 (1973), the Court explained that a plaintiff could meet his burden of establishing a prima facie case of racial discrimination by showing:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

some nondiscriminatory reason. The prima facie case is therefore insufficient to shift the burden of *proving* a lack of discriminatory intent to the defendant.

The prima facie case of disparate impact established by a showing of a significant statistical disparity is notably different. Unlike a claim of intentional discrimination, which the *McDonnell Douglas* factors establish only by inference, the disparate impact caused by an employment practice is *directly* established by the numerical disparity. Once an employment practice is shown to have discriminatory consequences, an employer can escape liability only if it persuades the court that the selection process producing the disparity has "'a manifest relationship to the employment in question.'" *Connecticut* v. *Teal*, 457 U. S. 440, 446 (1982), quoting *Griggs* v. *Duke Power Co.*, 401 U. S., at 432. The plaintiff in such a case already has proved that the employment practice has an improper effect; it is up to the employer to prove that the discriminatory effect is justified.

Intertwined with the plurality's suggestion that the defendant's burden of establishing business necessity is merely one of production is the implication that the defendant may satisfy this burden simply by "producing evidence that its employment practices are based on legitimate business reasons." *Ante*, at 998. Again, the echo from the disparate-treatment cases is unmistakable. In that context, it is enough for an employer "to articulate some legitimate, nondiscriminatory reason" for the allegedly discriminatory act in order to rebut the presumption of intentional discrimination. *McDonnell Douglas*, 411 U. S., at 802. But again the plurality misses a key distinction: An employer accused of discriminating intentionally need only dispute that it had any such intent—which it can do by offering *any* legitimate, nondiscriminatory justification. Such a justification is simply not enough to legitimize a practice that has the effect of excluding a protected class from job opportunities at a significantly disproportionate rate. Our cases since *Griggs* make

clear that this effect itself runs afoul of Title VII unless it is "necessary to safe and efficient job performance." *Dothard* v. *Rawlinson*, 433 U. S., at 332, n. 14. See also *Nashville Gas Co.* v. *Satty*, 434 U. S. 136, 143 (1977) (issue is whether "a company's business necessitates the adoption of particular leave policies"); *Griggs* v. *Duke Power Co.*, 401 U. S., at 432 ("[A]ny given requirement must have a *manifest* relationship to the employment in question") (emphasis added).

Precisely what constitutes a business necessity cannot be reduced, of course, to a scientific formula, for it necessarily involves a case-specific judgment which must take into account the nature of the particular business and job in question. The term itself, however, goes a long way toward establishing the limits of the defense: To be justified as a business *necessity* an employment criterion must bear more than an indirect or minimal relationship to job performance. See *Dothard* v. *Rawlinson*, 433 U. S., at 331–332 (absent proof that height and weight requirements directly correlated with amount of strength deemed "essential to good job performance," requirements not justified as business necessity); *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 431, quoting the Equal Employment Opportunity Commission's (EEOC's) Uniform Guidelines on Employee Selection Procedures, 29 CFR § 1607.4(c) (1974) ("The message of these Guidelines is the same as that of the *Griggs* case—that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be 'predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job'"). Cf. *Washington* v. *Davis*, 426 U. S. 229, 247 (1976) (Title VII litigation "involves a more probing judicial review, and less deference to the seemingly reasonable acts of [employers] than is appropriate under the Constitution where special racial impact, without discriminatory purpose, is claimed"). The criterion must directly relate to a prospective employee's ability to perform the job effectively. And even where an employer

proves that a particular selection process is sufficiently job related, the process in question may still be determined to be unlawful, if the plaintiff persuades the court that other selection processes that have a lesser discriminatory effect could also suitably serve the employer's business needs. *Albemarle Paper Co.* v. *Moody*, 422 U. S., at 425. In sum, under *Griggs* and its progeny, an employer, no matter how well intended, will be liable under Title VII if it relies upon an employment-selection process that disadvantages a protected class, unless that process is shown to be necessary to fulfill legitimate business requirements. The plurality's suggestion that the employer does not bear the burden of making this showing cannot be squared with our prior cases.

## II

I am also concerned that, unless elaborated upon, the plurality's projection of how disparate-impact analysis should be applied to subjective-selection processes may prove misleading. The plurality suggests: "In the context of subjective or discretionary employment decisions, the employer will often find it easier than in the case of standardized tests to produce evidence of a 'manifest relationship to the employment in question.'" *Ante*, at 999. This statement warrants further comment in two respects.

### A

As explained above, once it has been established that a selection method has a significantly disparate impact on a protected class, it is clearly not enough for an employer merely to *produce* evidence that the method of selection is job related. It is an employer's obligation to *persuade* the reviewing court of this fact.

While the formal validation techniques endorsed by the EEOC in its Uniform Guidelines may sometimes not be effective in measuring the job-relatedness of subjective-selection

processes,[5] a variety of methods are available for establishing the link between these selection processes and job performance, just as they are for objective-selection devices. See 29 CFR §§ 1607.6(B)(1) and (2) (1987) (where selection procedure with disparate impact cannot be formally validated, employer can "justify continued use of the procedure in accord with Federal law"). Cf. *Washington* v. *Davis*, 426 U. S., at 247, and n. 13 (hiring and promotion practices can be validated in "any one of several ways"). The proper means of establishing business necessity will vary with the type and size of the business in question, as well as the particular job for which the selection process is employed. Courts have recognized that the results of studies, see *Davis* v. *Dallas*, 777 F. 2d 205, 218–219 (CA5 1985) (nationwide studies and reports showing job-relatedness of college-degree requirement), cert. denied, 476 U. S. 1116 (1986); the presentation of expert testimony, 777 F. 2d, at 219–222, 224–225 (criminal justice scholars' testimony explaining job-relatedness of college-degree requirement and psychologist's testimony explaining job-relatedness of prohibition on recent marijuana use); and prior successful experience, *Zahorik* v. *Cornell University*, 729 F. 2d 85, 96 (CA2 1984) ("generations" of experience reflecting job-relatedness of decentralized decisionmaking structure based on peer judgments in academic setting), can all be used, under appropriate circumstances, to establish business necessity.[6] Moreover, an employer that

---

[5] The American Psychological Association, co-author of Standards for Educational and Psychological Testing (1985), which is relied upon by the EEOC in its Uniform Guidelines, has submitted a brief as *amicus curiae* explaining that subjective-assessment devices are, in fact, amenable to the same "psychometric scrutiny" as more objective screening devices, such as written tests. Brief for the American Psychological Association as *Amicus Curiae* 2. See also Bartholet, Application of Title VII to Jobs in High Places, 95 Harv. L. Rev. 947, 987–988 (1982) (discussing feasibility of validating subjective hiring assessments).

[6] As a corollary, of course, a Title VII plaintiff can attack an employer's offer of proof by presenting contrary evidence, including proof that the em-

complies with the EEOC's recordkeeping requirements, 29 CFR §§ 1607.4 and 1607.15 (1987), and keeps track of the effect of its practices on protected classes, will be better prepared to document the correlation between its employment practices and successful job performance when required to do so by Title VII.

The fact that job-relatedness cannot always be established with mathematical certainty does not free an employer from its burden of proof, but rather requires a trial court to look to different forms of evidence to assess an employer's claim of business necessity. And while common sense surely plays a part in this assessment, a reviewing court may not rely on its own, or an employer's, sense of what is "normal," *ante,* at 999, as a substitute for a neutral assessment of the evidence presented. Indeed, to the extent an employer's "normal" practices serve to perpetuate a racially disparate status quo, they clearly violate Title VII unless they can be shown to be necessary, in addition to being "normal." See *Griggs* v. *Duke Power Co.,* 401 U. S., at 430 ("[P]ractices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the [discriminatory] status quo").

## B

The plurality's prediction that an employer "will often find it easier" *ante,* at 999, to justify the use of subjective practices as a business necessity is difficult to analyze in the abstract. Nevertheless, it bears noting that this statement

---

ployer's hiring methods failed in fact to screen for the qualities identified as central to successful job performance. In this case, for example, petitioner could produce evidence that Kevin Brown, one of the white employees chosen over her for a promotion, allegedly in part because of his greater "supervisory experience," proved to be totally unqualified for the position. App. 113. Six months after Brown was promoted, his performance was evaluated as only "close to being 'competent.'" 1 Record 68. When he resigned soon thereafter, allegedly under pressure, he questioned whether "poor communication . . . , inadequate training," or his personality had rendered him unqualified for the job. *Id.,* at 85.

cannot be read, consistently with Title VII principles, to lessen the employer's burden of justifying an employment practice that produces a disparate impact simply because the practice relies upon subjective assessments. Indeed, the less defined the particular criteria involved, or the system relied upon to assess these criteria, the more difficult it may be for a reviewing court to assess the connection between the selection process and job performance. Cf. *Albemarle Paper Co.* v. *Moody,* 422 U. S., at 433 (validation mechanism that fails to identify "whether the criteria *actually* considered were sufficiently related to the [employer's] legitimate interest in job-specific ability" cannot establish that test in question was sufficiently job related). For example, in this case the Bank supervisors were given complete, unguided discretion in evaluating applicants for the promotions in question.[7] If petitioner can successfully establish that respondent's hiring practice disfavored black applicants to a significant extent, the bald assertion that a purely discretionary selection process allowed respondent to discover the best people for the job, without any further evidentiary support, would not be enough to prove job-relatedness.[8]

Allowing an employer to escape liability simply by articulating vague, inoffensive-sounding subjective criteria would disserve Title VII's goal of eradicating discrimination in employment. It would make no sense to establish a general rule whereby an employer could more easily establish busi-

---

[7] One of the hiring supervisors testified that she was never given any guidelines or instructions on her hiring and promotion decisions. App. 161–162. Another testified that he could not attribute specific weight to any particular factors considered in his promotion decisions because "fifty or a hundred things" might enter into such decisions. *Id.,* at 135.

[8] Because the establishment of business necessity is necessarily case specific, I am unwilling to preclude the possibility that an employer could *ever* establish that a successful selection among applicants required granting the hirer near-absolute discretion. Of course, in such circumstances, the employer would bear the burden of establishing that an absence of specified criteria was necessary for the proper functioning of the business.

ness necessity for an employment practice, which left the assessment of a list of general character qualities to the hirer's discretion, than for a practice consisting of the evaluation of various objective criteria carefully tailored to measure relevant job qualifications.   Such a rule would encourage employers to abandon attempts to construct selection mechanisms subject to neutral application for the shelter of vague generalities.[9]

While subjective criteria, like objective criteria, will sometimes pose difficult problems for the court charged with assessing the relationship between selection process and job performance, the fact that some cases will require courts to develop a greater factual record and, perhaps, exercise a greater degree of judgment, does not dictate that subjective-selection processes generally are to be accepted at face value, as long as they strike the reviewing court as "normal and legitimate."   *Ante,* at 999.[10]   *Griggs* teaches that employment practices "fair in form, but discriminatory in opera-

---

[9] See *Atonio* v. *Wards Cove Packing Co.*, 810 F. 2d 1477, 1485 (CA9) (en banc) ("It would subvert the purpose of Title VII to create an incentive to abandon efforts to validate objective criteria in favor of purely discretionary hiring methods"), on return to panel, 827 F. 2d 439 (1987), cert. denied, No. 87–1388, 485 U. S. 989 (1988), cert. pending, No. 87–1387; *Miles* v. *M.N.C. Corp.*, 750 F. 2d 867, 871 (CA11 1985) (subjective assessments involving white supervisors provide "ready mechanism" for racial discrimination).   Cf. Doverspike, Barrett, & Alexander, The Feasibility of Traditional Validation Procedures for Demonstrating Job-Relatedness, 9 Law & Psychology Rev. 35, 35 (1985) (noting that "litigious climate has resulted in a decline in the use of tests and an increase in more subjective methods of hiring").

[10] Nor can the requirement that a plaintiff in a disparate-impact case specify the employment practice responsible for the statistical disparity be turned around to shield from liability an employer whose selection process is so poorly defined that no specific criterion can be identified with any certainty, let alone be connected to the disparate effect.   Cf. *ante,* at 994 (plaintiff is responsible "for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities").

tion,'' cannot be tolerated under Title VII. 401 U. S., at 431. This lesson should not be forgotten simply because the "fair form" is a subjective one.

JUSTICE STEVENS, concurring in the judgment.

The question we granted certiorari to decide, though extremely important, is also extremely narrow. It reads as follows:

> "Is the racially adverse impact of an employer's practice of simply committing employment decisions to the unchecked discretion of a white supervisory corps subject to the test of *Griggs vs. Duke Power Co.*, 401 U. S. 424 (1971)?" Pet. for Cert. i.

Essentially for the reasons set forth in Parts II–A and II–B of JUSTICE O'CONNOR's opinion, I agree that this question must be answered in the affirmative. At this stage of the proceeding, however, I believe it unwise to announce a "fresh" interpretation of our prior cases applying disparate-impact analysis to objective employment criteria. See *ante*, at 994. Cases in which a Title VII plaintiff challenges an employer's practice of delegating certain kinds of decisions to the subjective discretion of its executives will include too many variables to be adequately discussed in an opinion that does not focus on a particular factual context. I would therefore postpone any further discussion of the evidentiary standards set forth in our prior cases until after the District Court has made appropriate findings concerning this plaintiff's prima facie evidence of disparate impact and this defendant's explanation for its practice of giving supervisors discretion in making certain promotions.