**Patricia A. COLBERT**

v.

**STATE OF MARYLAND DEPARTMENT OF CORRECTIONS, MARYLAND CORRECTIONAL INSTITUTION.**

**No. Civil HM–84–4287.**

United States District Court, D. Maryland.

April 13, 1989.

Edward J. Gutman, Blum, Yumkas, Mailman, Gutman & Denick, Baltimore, Md., for plaintiff.

J. Joseph Curran, Jr., Atty. Gen., Scott S. Oakley, Div. of Correction, Baltimore, Md., for defendant.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Plaintiff Patricia Colbert brought this action against the State of Maryland Department of Corrections, Maryland Correctional Institute ("Department"), alleging discrimination on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended 1972. Colbert contends that the promotion of four male correctional officers instead of

her to the position of Correctional Officer IV was made solely because they are male.

Defendant contends that these men were better qualified than plaintiff, that when two of them were promoted the defendant lacked the power under state regulations to promote plaintiff, and that gender played no role in the promotion decisions.

The Court conducted a bench trial on September 7, 1988 and September 13, 1988. The Court heard:

(1) testimony from the plaintiff, Patricia Colbert;

(2) testimony from Thomas E. Diggin, personnel administrator with the Maryland Department of Personnel; and

(3) testimony from Warden Sebastian Valenti, who made the promotion decisions in question.

In addition, many facts were stipulated to in the pretrial Order.

The Court has considered this testimony, the other evidence admitted at trial, the stipulated facts, and the proposed findings of fact and conclusions of law submitted by the parties after the trial, and is now prepared to rule.

The Court rules that defendant had legitimate, non-discriminatory reasons for each of the promotional decisions in question, and that these reasons were not a pretext for sex discrimination. The Court therefore will enter judgment in favor of the defendant. The Court's findings of fact and conclusions of law follow.

FINDINGS OF FACT

Patricia Colbert had been employed by the Maryland Department of Corrections as a Correctional Officer since July 1975. Until she returned from a maternity leave on January 28, 1982, she was assigned to the Maryland House of Corrections.

Colbert was promoted to the rank of Correctional Officer III (sometimes referred to as "sergeant" or "CO III"), on April 18, 1979.

In June 1980, Colbert took the State Department of Personnel examination for Correctional Officer IV (sometimes referred to as "CO IV" or "Lieutenant"). She was thereafter placed on a Certification of Eligibles list as eligible for appointment to Correctional Officer IV through August 30, 1982.

In May 1981, Colbert, who was then assigned to the Maryland House of Correction, commenced a maternity leave.

A vacancy existed for a CO IV at the Maryland Correctional Institute–Jessup (sometimes referred to as "MCI-J") on November 25, 1981.

At all times relevant to this lawsuit, Sebastian Valenti was the Warden of the Maryland Correctional Institution—Jessup, and the "appointing authority" for all Correctional Officer IV positions.

When the Department first employed Colbert, it permitted female corrections officers to wear either a uniform skirt or uniform trousers, at their election. Although Department policy changed at some point during the duration of Colbert's service at the Maryland House of Corrections, so that female officers were required to wear trousers instead of skirts, her superiors at the institution nevertheless permitted her to wear a skirt the entire time until she took maternity leave, without objection.

On January 27, 1982, Colbert completed her maternity leave and returned to duty as a CO III at her newly assigned institution—the Maryland Correctional Institution–Jessup. She was wearing a skirt.

Colbert's supervisor, Lieutenant Boteler, detained her after roll call on that first day back because she was wearing a skirt. After verifying Department policy regarding the skirt prohibition, Boteler ordered her to put on the uniform pants. Colbert refused, stating that it was against her religious beliefs to wear pants. Colbert was referred to Captain Wilson and then to Major Vernon, the same exchange being repeated each time, with the officers ordering her to put on pants and Colbert stating that she could not because of her religious beliefs. This account of the events is undisputed, and is corroborated by the testimony of Colbert and Valenti, and the written reports of two of the other officers involved.

At trial, Colbert testified that she considered wearing pants to be very revealing,

and as a Christian she did not want to wear something that left nothing to the imagination.

Colbert then asked to see the warden. Warden Valenti told her to put on the trousers. He told her that if she didn't wear pants, she would be suspended for the rest of the day, and if she returned to work in a skirt, she would be terminated. When Colbert again refused to put on the pants, she was suspended for the remainder of the day. This was a disciplinary suspension for insubordination. Colbert reported to work the next day wearing pants.

In February 1982, plaintiff Colbert contacted Richard Bahr of the Personnel Office to ask why she had not recently been contacted for an interview for the position of Correctional Officer IV. Mr. Bahr referred plaintiff Colbert to Warden Valenti. Plaintiff Colbert was later informed by Assistant Warden Cornelius Royster that Warden Valenti did not want to select a candidate for Correctional Officer IV until a new Certification of Eligibles list of candidates was issued by the Department of Personnel.

On March 6, 1982, the Department of Personnel administered an examination for the classification Correctional Officer IV. Plaintiff Colbert took this examination.

On April 13, 1982, a Correctional Officer IV vacancy existed at the Maryland Correctional Institution–Jessup. On that date, Colbert was the only promotional candidate on the then-existing Certification of Eligibles list available for appointment to Correctional Officer IV.

Under Department of Correction regulations, Warden Valenti, the appointing authority at MCI–J, had the power to select Colbert for promotion to Correctional Officer IV or to request a new list from the State's Department of Personnel if no "satisfactory selection" could be made from among the eligibles.

Warden Valenti anticipated one or more promotional vacancies for Correctional Officer IV occurring in 1982.

All of Colbert's evaluations as a Correctional Officer had been either "satisfactory" or "superior."

Through local community colleges, Colbert had completed courses (with A's and B's) in criminology, correction casework, and the history and philosophy of corrections, and had been an instructor in the House of Correction's In–Service Training Program in 1980 and 1981. Among her students were Walter Pollock, John Schmitt, Nathan Rollins and Jesse James. Documentation of these achievements was in her personnel file.

However, Warden Valenti did not promote Colbert in early 1982 when she was the only person eligible for promotion to CO IV at MCI–J, but either requested or simply waited for a new list of eligibles from the Department of Personnel.

Valenti had two reasons for not promoting Colbert at this time and instead seeking a new list: (1) he wanted to have a larger pool of candidates from which to select, instead of a pool of one; and (2) his first and only contact with that one candidate, Colbert, had been a negative one (the dress incident).

At that time, not a single female had ever attained the rank of CO IV at a male correctional institution. There were 107 male CO IV's at these institutions.

A new Certification of Eligibles list for Correctional Officer IV, dated May 13, 1982, and based upon the March 6, 1982 examination, was provided to Warden Valenti in May of 1982.

Colbert's exam score had improved from 86.5 in 1980 to 92.5 in 1982.

On May 17, 1982, Colbert submitted a grievance to Warden Valenti stating: "I feel that I am being unfairly discriminated in relation to my opportunities to be promoted to CO IV. I feel I should be promoted to CO IV, regardless of my sex." On May 17, 1982, Colbert was informed by Warden Valenti that there were currently two vacancies for the position of Correctional Officer IV, and that other vacancies were expected shortly. On that date, Colbert agreed to hold her grievance in abey-

ance until interviews of candidates from the Certification of Eligibles list dated May 13, 1982 were completed. Colbert was among the candidates from the May 13, 1982 list who were interviewed.

Colbert was ranked seventh among the CO III's at MCI–J on the Certification of Eligibles list dated May 13, 1982.

Warden Valenti was required to select only from among the top five ranked candidates on the Certification of Eligibles list for each Correctional Officer IV vacancy. On June 9, 1982, Warden Valenti selected Nathan Rollins and Jesse James, both men, for two Correctional Officer IV vacancies. Rollins and James were within the top five ranked candidates on the list and Colbert was not, so Colbert was ineligible for appointment to the vacancies to which Rollins and James were appointed.

On August 4, when Colbert's name was among the top five candidates on the eligibility list for CO IV, Valenti promoted John Schmitt to CO IV in preference to Colbert.

Warden Valenti testified that in each instance of promotion to lieutenant, he considered for each candidate: (1) the disciplinary record of the candidate; (2) the written examination scores of the candidate; (3) the past annual efficiency ratings of the candidate; (4) personal on-the-job observation of the performance of the candidate; (5) the recommendations of the supervisors of the candidate; (6) the interview scores of the candidate; (7) the candidate's personnel file; (8) the candidate's record of attendance and lateness; and (9) the candidate's length of service as a CO III.

John Schmitt had been a Correctional Officer III since April 1, 1981, two years less than Colbert.

Schmitt had been rated "unsatisfactory" for "Work Habits" in his 1979 "Probation and Annual Efficiency Rating Report" dated March 27, 1980, because of a need for improvement in his attendance.

As documented in writing in Schmitt's personnel file, Schmitt had been charged with attendance and/or lateness problems in 1977, 1978, 1979, 1980, and 1981 and had received counselling from his supervisors in these years. At least a substantial part of Schmitt's attendance problems were medically-related.

Schmitt's written test score on the Certification of Eligibles list was higher than Colbert's; Schmitt's was at the top of the list with a test score of 96.0, and Colbert's test score was 92.5.

Schmitt's interview score was higher than Colbert's; Schmitt's score was 78.0, and Colbert's score was 71.0.

Schmitt's annual efficiency ratings, on the whole, were superior to Colbert's annual efficiency ratings, as the following table demonstrates:

|  | Schmitt | Colbert |
|---|---|---|
| 1981 | 3 superiors<br>1 satisfactory | 4 satisfactorys |
| 1980 | 1 superior<br>3 satisfactorys | not available |
| 1979 | 1 superior<br>2 satisfactorys<br>1 unsatisfactory | 1 superior<br>3 satisfactorys |
| 1978 | 2 superiors<br>2 satisfactorys | 1 superior<br>3 satisfactorys |
| 1977 | 4 satisfactorys | 4 satisfactorys |

Warden Valenti testified that he selected Schmitt because he felt that Schmitt was overall better qualified than Colbert or the other candidates.

On November 24, 1982, Valenti promoted Walter Pollock to CO IV in preference to Colbert.

On July 12, 1982, Pollock accidentally fired a shotgun while inspecting it inside the Master Control Center at MCI–J, damaging the ceiling. Major Vernon, after investigation, found that "Sergeant Pollack [sic] placed himself and another officer in immediate physical danger by using poor judgment and was careless in his handling of the weapon.... Therefore, I recommend stringent disciplinary action in the form of a five (5) day suspension."

Warden Valenti suspended Pollock for three (3) days without pay, finding that he used "poor judgment," and was "careless", "negligen[t]", and "inefficien[t]." At trial, Warden Valenti stated that discharging a weapon in the building was a serious mistake, worthy of a three (3) day suspension,

and he again stated that Pollock had exercised poor judgment in this incident.

On cross-examination, Valenti conceded that this was a more serious incident than Colbert's dress incident.

According to Warden Valenti, exercising good judgment would be extremely important for someone filling the position of CO IV.

On September 22, 1982, Pollock had been counselled by Lt. Jesse James for his "persistent lateness" and was advised that "extensive lateness can and will affect his yearly evaluation and job performance ratings." On the same day, Pollock was "charged with" violation of Department of Correction Regulation 50–2—Tardiness and Attendance by Captain Holland.

On October 13, Pollock had been counselled by Lt. J.W. Schmitt for his "excessive lateness for duty" and advised that "excessive tardiness in attendance can and will affect his yearly evaluation and job performance rating." Pollock "was advised that this was a counseling and not a disciplinary action."

Pollock's annual efficiency ratings were superior to Colbert's, as the following table demonstrates:

| | Pollock | Colbert |
|---|---|---|
| 1981 | 2 superiors 2 satisfactorys | 4 satisfactorys |
| 1980 | 4 superiors | not available |
| 1979 | 2 superiors 2 satisfactorys | 1 superior 3 satisfactorys |
| 1978 | 2 superiors 2 satisfactorys | 1 superior 3 satisfactorys |
| 1977 | 1 superior 3 satisfactorys | 4 satisfactorys |

Pollock's annual efficiency ratings also contained numerous highly favorable comments:

**1981**

**Work Quality:** Display[s] initiative and knowledge in all job assignments. He knows and understand[s] the functions of Correctional Work, quick to understand, demonstrates enthusiasm and accepts responsibilities willingly.

**Work Quantity:** Utilize[s] time very effectively and does not abuse privileges.

He takes a positive approach to all job assignments. A willing and understanding worker who contribute[s] very effectively to this shift operations 11–7.

**Work Attitude:** Dependable and very cooperative, he respond[s] constructively to criticism.

**1981 (4/1/81—10/1/81)**

**Work Quality:** This officer has an excellent overall knowledge of his duties and of the organization. He carries out assignments in an efficient and timely manner with a minimum of supervision.

**Work Quantity:** Officer can be looked to to accomplish all duties (work) assigned and to frequently request additional assignment(s).

**Work Attitude:** This officer extends cooperation in most every instance and he reacts to instruction well. Areas for development include tact and in some situations relations with others. It is felt these areas will develop favorably in a minimum length of time.

**Work Habits:** Officers [sic] needs to apply himself to developing somewhat more steady reporting for duty in timely fashion. This is by no means a major problem and it is a matter which no doubt will be rectified.

**1980**

**Work Quality:** When given an assignment Mr. Pollock carries it out with little or no supervision required. His reports on any given subject are accurately and neatly prepared and he shows full knowledge of all job requirements.

**Work Quantity:** Mr. Pollock handles special and regular assignments with skill and tact and often goes beyond what is required of him to get a job done.

**Work Attitude:** I find Mr. Pollock to be quite cooperative and dependable when dealing with other employees and residents. He is adaptable to any given situation and shows a very good attitude toward instruction and direction.

**Work Habits:** Mr. Pollock does not abuse privileges or state property. He has a positive effect on the work of others. Although Mr. Pollock did use 88 hours of sick leave it must be noted that

80 of these hours was for a period of hospitalization and recuperation for an illness.

**1979**

**Work Quality:** Mr. Pollock has the distinction of doing classification work in addition to his duties as a correctional officer. His work under the pressure of wearing both hats (security and classification) has been excellent. He has organized the work so as to get maximum usage of the time devoted to both areas.

**Work Attitude:** Officer Pollock has shown a great deal of maturity in his performance and attitude. He has the needed ability of defusing potentially explosive situations. He has established a good rapport with the residents and his peers. He deals effectively with the public maintaining a courteous attitude at all times. He has progressed greatly in this general area of attitude. His continued progress will make him a valued promotional candidate.

**1978**

**Work Quality:** Officer Pollock has a talent for report writing. His neatness and accuracy are among the best.

**Work Attitude:** Officer Pollock has a good relationship with other employees.

**1977**

**Work Quality:** Officer Pollock CO II deserves a superior in work quality due to his initiative in assuming designated duties in a professional manner.

Pollock's written test score on the Certification of Eligibles list was higher: Pollock was at the top of the list with a test score of 95.5, and Colbert's test score was 92.5.

Pollock's interview score was 61; Colbert's 71.

Warden Valenti gave the exam and interview scores equal weight, averaging them together. Thus, Colbert's 1982 average was 81.75, and Pollock's was 78.15.

In three separate sworn statements given by Warden Valenti, he referred to the interview score as a factor he considered in making promotions, and compared the interview scores of Schmitt to Colbert, but made no comparison of Pollock's and Colbert's interview scores.

Pollock had been a Correctional Officer III since April 1, 1981, two years less than Colbert.

For the year 1982, (the year in which she was passed over for promotion on three separate occasions), Colbert's Annual Efficiency Rating given by her immediate supervisors was "overall superior." She received "superior" ratings in three of four areas rated. Based upon personal observation and knowledge of her work, her evaluators remarked:

**Work Quality:** Sgt. Colbert performs all duties & assignments in a very professional manner.

**Work Quantity:** Sgt. Colbert completes all assignments on time and they are neat and precise.

**Work Attitude:** Sgt. Colbert has no problem with fellow employees & supervisors.

There was no reference to the skirt incident.

As Pollock's Annual Efficiency Rating for 1982 was not offered in evidence, there was no evidence to show that Pollock's ratings for the year 1982 were equal to or superior to Colbert's.

Whenever, during the course of 1982, Valenti asked Colbert's and Pollock's supervisors about them, their supervisors gave favorable reports as to each of them.

CONCLUSIONS OF LAW

A. *Disparate Impact*

■ In a post-trial letter to the Court, the plaintiff has requested consideration of her case under a disparate impact analysis, relying on the recent Supreme Court case of *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). *Watson* established that promotional decisions involving subjective selection criteria and processes could be analyzed under a disparate impact theory as well as a disparate treatment theory. However, while the Court agrees that this case may have been susceptible to such an analysis, plaintiff's request comes too late to be considered now. All along, plaintiff

has proceeded under a disparate treatment theory *alone.* *See e.g.*, Pretrial Order, plaintiff's statement of facts to be proven, paragraph W ("This is a disparate treatment case under Title VII of the 1964 Civil Rights Act."). While plaintiff correctly cites *Wright v. National Archives and Records Service*, 609 F.2d 702, 711 (4th Cir.1979) (en banc) for the proposition that no procedural *election between* disparate impact and disparate treatment theories is required at the pretrial, trial or appellate stages, this does not relieve the plaintiff of her obligation to properly plead, proceed under and prove each theory. *Wright*, 609 F.2d at 711 ("As [alternative theories], in keeping with general rules of civil procedure, they may properly be pleaded, Fed.R. Civ.P. 8(e)(2), and if sufficiently supported by evidence, Fed.R.Civ.P. 41(b), analyzed by the trier of fact as alternative grounds of relief."). Although *Watson* had been decided over two months before trial, and *Wright* had been Fourth Circuit law for nine years, plaintiff did not at any time before or during the trial state that she sought to proceed under a disparate impact as well as a disparate treatment theory. Under these circumstances, if "[d]efendant ... produced no evidence to show that its selection process was job related or had a business necessity," as plaintiff contends, it is because plaintiff never put defendant on notice that it should do so. As plaintiff did not try this case under a disparate impact theory, counsel's belated realization of that theory's availability will not suffice to have the Court decide this case under that theory.[1]

## B. *Disparate Treatment*

In opinions dated November 23, 1987 and April 20, 1988, this Court detailed the requirements for a prima facia case of disparate treatment, and held that Colbert had made out her prima facia case. The discussion therein is incorporated by reference. The evidence adduced at trial bore out the allegations necessary to support a prima facie case, and this Court accordingly denied the motion to dismiss under Fed.R. Civ.P. 41(b) which was made by the defendants at the close of plaintiff's case. The defendant having proffered legitimate, nondiscriminatory reasons for the failure to promote Colbert, the Court is now faced with the ultimate question of whether the defendant, through Warden Valenti, intentionally discriminated against Colbert on the basis of her sex. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Each decision point will be examined in turn.

### (1) *Valenti's decision to call for a new list*

Colbert contends that the Warden intentionally discriminated against her on or about April 13, 1982, when a CO IV vacancy existed at MCJ–I. Colbert was the only candidate then eligible for promotion to that vacancy, but Warden Valenti chose not to promote her at that time but rather to request or await a new list of eligibles. The Court is satisfied that this decision was not made on the basis of Colbert's gender. The Court finds credible Warden Valenti's assertion that, as his only contact with the plaintiff had been to discipline her, he wished to have a larger pool of candidates from which to select.

### (2) *The promotions of Rollins and James*

Plaintiff contends that after this new list of eligibles had been generated, Warden Valenti discriminated against her by promoting Nathan Rollins and Jesse James on June 9, 1982 instead of her. This contention must fail because, as Colbert was not among the top five ranked candidates on this new list, the Warden lacked the power to promote her. Rollins and James were eligible for promotion and Colbert was not, so there was no opportunity for discrimination in the decision to promote them.

---

**1.** Although this particular plaintiff will, in all likelihood, be barred by res judicata from challenging the subjective decision-making process which may have led to a failure to promote females to the position of CO IV, that process could be subject to challenge by other individual plaintiffs or in a class action.

### (3) *The promotion of Schmitt*

█ Plaintiff next contends that she was discriminated against on August 4, 1982, when John Schmitt was promoted in preference to her. Colbert was eligible for promotion at this time, as the removal of James and Rollins from the list of eligibles placed her among the top five ranked candidates.

The Court finds that plaintiff has not sustained her burden of proving intentional discrimination in this decision. The available objective criteria clearly support Warden Valenti's assertion that he felt Schmitt was overall better qualified than Colbert or any other of the eligible candidates. Schmitt had significantly higher scores than Colbert on both the interview and the written test; indeed, Schmitt's written test score was higher than that of any other eligible candidate. As demonstrated by the table on page 78, *supra*, Schmitt's annual efficiency ratings were also superior to Colbert's. Although it is true that Schmitt had persistent attendance and lateness problems, the Court is not persuaded that these were so egregious as to overwhelm Schmitt's superiority to Colbert on the written test, interview, and annual efficiency ratings and to convert these neutral criteria into a pretext for discrimination, especially given the medical basis for many of Schmitt's attendance problems.

### (4) *The promotion of Pollock*

█ The promotion of Walter Pollock in preference to plaintiff on November 24, 1982 presents the closest question in this case. The Court finds the words of the Supreme Court in *Aikens, supra,* particularly apt here:

> All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult.... There will seldom be "eyewitness" testimony as to the employer's mental processes. But ... [t]he law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago: "The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." *Edgington v. Fitzmaurice,* 29 Ch. Div. 459, 483 (1885).

460 U.S. at 716–17, 103 S.Ct. at 1482.

The Court finds that plaintiff has not carried her burden of proving that, in promoting Pollock in preference to herself, Warden Valenti intentionally discriminated against her on the basis of her sex.

This promotion was questionable. Pollock had been disciplined more recently than Colbert, and more severely, receiving a three-day suspension to Colbert's one-day suspension. Pollock had recently been counselled for attendance and tardiness, although this was not a disciplinary action. Pollock's interview score was lower than Colbert's by a great enough margin so that, when averaged with the written test scores, Colbert had a slightly higher overall score.

However, Pollock's annual efficiency ratings were much better than Colbert's, and the verbal comments on those ratings gave Pollock glowing praise.

Thus, a creditable case can be made for promoting either Pollock or Colbert. In the absence of direct evidence of gender-based discrimination, the Court cannot escape the feeling that it is merely second-guessing a promotional decision made by Warden Valenti for which there was a substantial basis. As plaintiff bears the burden of proving intentional discrimination, the Court must enter judgment for the defendants with regard to the decision to promote Walter Pollock, as well as the three earlier decisions examined in this Memorandum.

The Court will enter a separate Order consistent with this Memorandum.