Shilda PEOPLES, Plaintiff,

v.

**STATE OF FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES,** Defendant.

No. 95–40200–RH.

United States District Court, N.D. Florida, Tallahassee Division.

Sept. 30, 1998.

Larry Kay White, Larry K. White PA, John Warrington Hedrick, John W Hedrick PA, Tallahassee, FL, Jack Linden McLean, Mack Williams Haygood et al., Atlanta, GA, for Shilda Peoples, plaintiff.

Janice L. Jennings, Attorney General State of Florida, Tallahassee, FL, Lainie Susan Krop, State Attorney, Gainesville, FL, Joseph Lewis, Jr., Attorney General, State of Florida, for Defendants State of Florida, Dept. of Health an Rehabilitative Serv., Florida State Hosp.

Chesterfield Smith, State of Florida, Civil Litigation Hrs. Field Office, Tallahassee, FL, for Defendants Edward A. Feaver, Robert Williams.

## MEMORANDUM OPINION

HINKLE, District Judge.

In this action plaintiff Shilda Peoples asserts that on four separate occasions her employer denied her a promotion because of her race. Ms. Peoples was a Senior Registered Nurse at the Florida State Hospital, which was operated by the defendant State of Florida Department of Health and Rehabilitative Services.[1] On each of the four occasions at issue, Ms. Peoples, an African American, sought a promotion to the position

---

1. The Department of Health and Rehabilitative Services no longer exists. The Department of Children and Families is its successor in all relevant respects. This opinion refers to "the Department" to mean the Department of Health and Rehabilitative Services or its successor, the Department of Children and Families, as may be appropriate in the context.

of Senior Registered Nurse *Supervisor*. On each occasion, the Registered Nurse who received the promotion was white.

Ms. Peoples challenges the two most recent of the four promotion decisions (both of which occurred in 1993) under Title VII of the Civil Rights Act of 1964, as amended, and under 42 U.S.C. § 1983. She challenges the two older promotion decisions (which occurred in 1991 and 1992 respectively) only under § 1983; any challenge to these promotion decisions under Title VII was time barred prior to the commencement of this action.[2] Ms. Peoples seeks damages and declaratory and injunctive relief under Title VII and seeks declaratory and injunctive relief (but, recognizing the Department's Eleventh Amendment immunity, not damages) under § 1983.

The Title VII claims have been tried to a jury, which returned a verdict finding that in rejecting Ms. Peoples' application for the 1993 promotions, the Department was motivated at least in part by intentional racial discrimination. The jury also found, however, that the Department would have chosen someone other than Ms. Peoples anyway, even in the absence of racial discrimination.

The § 1983 challenges to the 1991 and 1992 promotion decisions have been tried to the court, as has the issue of declaratory or injunctive relief arising from the jury's finding of racial discrimination with respect to the 1993 promotions. This opinion sets forth the court's ruling on these issues. I find that the Department was motivated in part by racial discrimination when it denied Ms. Peoples the 1991 and 1992 promotions, just as the jury found with respect to the 1993 promotions. I also find, however, that the Department would not have chosen Ms. Peoples for those promotions anyway, even in the absence of racial discrimination. I enter declaratory and injunctive relief in Ms. Peoples' favor under Title VII based on the Department's racially discriminatory actions regard-

ing the 1993 promotion decisions. I deny all other relief.

### Background—The McDonnell Douglas Framework

If race was a motivating factor in the Department's rejection of Ms. Peoples' application for the position of Senior Registered Nurse Supervisor, then the Department violated both the Fourteenth Amendment of the United States Constitution (which is enforceable under 42 U.S.C. § 1983) and Title VII of the Civil Rights Act of 1964, as amended. Ms. Peoples contends race was a motivating factor in the Department's decisions. The Department denies this. The Department also asserts that even if race was a motivating factor in its decisions, this made no difference; the Department claims Ms. Peoples would not have gotten the jobs anyway, without regard to any racial discrimination.

As one might expect, none of the Department's officials have said that race was a factor in the Department's decisions. Ms. Peoples relies instead on circumstantial evidence.

In a disparate treatment case not based on direct evidence, the starting point is the framework set forth in such cases as *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See generally Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1060 (11th Cir. 1994). This is so both under Title VII and under § 1983. *See, e.g., Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078 (11th Cir.1996).

Under that framework, the burden initially is on the plaintiff to establish a prima facie case. If the plaintiff meets this burden, a presumption of discrimination arises, and the burden shifts to the employer to put forth a legitimate reason for its action. This burden is "exceedingly light."[3] If the employer

---

**2.** The four positions at issue are Position No. 06157 (awarded to Ted R. Dunaway on September 6, 1991), Position No. 09671 (awarded to Gwendolyn Cook on April 14, 1992), Postion No. 06157 (awarded to William Dickson on February 2, 1993), and Position No. 46392 (awarded to Zilla Thompson on February 24, 1993).

**3.** *E.g., Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1061 (11th Cir.1994) (collecting earlier Eleventh Circuit cases).

meets this burden, the presumptions and burdens drop out of the case and the finder of fact proceeds to the ultimate issue: whether plaintiff has proven by the greater weight of the evidence that race was a motivating factor in the employer's decision.

In making that ultimate determination, the finder of fact may consider the reason proffered by the employer for its action. If the finder of fact concludes that that proffered reason was pretextual, the finder of fact may use this finding as a basis for concluding that race was a motivating factor in the employer's decision. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1529 (11th Cir.1997).

If the finder of fact concludes that race was a motivating factor in the employer's decision, the burden is on the employer to establish that it would have made the same decision anyway, without regard to race. If the employer carries that burden, the employer establishes a complete defense to the § 1983 claim. *See,` e.g., Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1084–85 n. 5 (11th Cir.1996); *Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1062 (11th Cir.1994). But the employer may still be liable under Title VII for declaratory and limited forms of injunctive relief (not including back pay or any order requiring that the plaintiff be promoted or placed in or reinstated to the position at issue). *See* 42 U.S.C. § 2000e–5(g)(2)(B); *Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1084–85 (11th Cir.1996).

### *Applying McDonnell Douglas to the Case at Bar*

Application of the McDonnell Douglas framework to the case at bar quickly moves the inquiry to the ultimate issue of racial discrimination, because Ms. Peoples has established a prima facie case and the Department has proffered a legitimate explanation for choosing someone other than Ms. Peoples for each of the four positions at issue. The basis for these conclusions follows.

In cases involving an existing employee's application for a promotion to an open position, the employee establishes a prima facie case by showing that (1) she belongs to a racial minority, (2) she was qualified for the open position, (3) her application for the position was rejected, and (4) the employer filled the position with a person not of plaintiff's race or continued to seek applicants from persons of plaintiff's qualifications. *See, e.g., Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997).

In the case at bar Ms. Peoples has clearly established a prima facie case: (1) she is African American, (2) she met all the qualifications for the position of Senior Registered Nurse Supervisor, (3) her applications for each of the four positions at issue were rejected, and (4) in each instance the Department filled the position with a white person. This is uncontested.

This shifts the burden to the Department to proffer a legitimate explanation for choosing someone other than Ms. Peoples for each of the four positions at issue. The Department has proffered as its legitimate explanation a race-neutral system by which applicants for each position were evaluated and the successful applicant chosen.

Under this system, each time there was an open Senior Registered Nurse Supervisor (or "SRN Supervisor") position, the Department posted a job announcement and solicited applications. Department officials developed a list of "knowledge, skills and abilities" ("KSAs") deemed desirable for the particular position but did not disclose the KSAs to the applicants.

The Department appointed an *ad hoc* committee to evaluate applicants on the basis of the KSAs. The committee compiled a list of criteria for rating applicants on each KSA, and each committee member independently assigned a numerical rating to each applicant for each KSA based solely on the applicant's written application. The four to six applicants who received the highest combined scores from all committee members based on the written applications were selected for interviews; the lower ranking applicants were eliminated. At that point the written applications and the ratings based on the written applications dropped out of the process.

The committee developed a list of interview questions (which were not disclosed to applicants in advance) and asked the same questions to each applicant at each interview. Each committee member assigned a numerical rating to each applicant for each question. The ratings of each committee member on each interview question were totaled for each ·applicant, and the applicant with the highest total score on the interview questions got the job.

This proffered explanation easily meets the Department's "exceedingly light" burden under the *McDonnell Douglas* framework. The *McDonnell Douglas* presumptions and burdens thus fall out of the case, and the analysis proceeds to the ultimate issues of whether race was a motivating factor in the Department's decisions and, if so, whether the Department would have made the same decision anyway, even in the absence of racial discrimination.

### Finding: The Department Was Motivated in Part by Race

■■■ The jury found that race was a motivating factor in the Department's rejection of Ms. Peoples' applications for the two 1993 openings. There was sufficient evidence from which a reasonable jury could so find. The jury's finding is binding on me as the finder of fact with respect to Ms. Peoples' claims for declaratory and injunctive relief with respect to those positions, *see, e.g., Beacon Theatres Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), and in any event I would reach the same conclusion on my own, without regard to the jury's findings. My finding is the same with respect to the 1991 and 1992 positions: race was a motivating factor in the Department's decisions.

This ultimate conclusion derives from a number of underlying facts.

First, the Department's selection system makes little sense. According to the De-

partment, it makes its selection among the four to six best qualified applicants for the position based solely on a single interview with each applicant. According to the Department, the performance on that single interview is determinative; the Department completely ignores such seemingly more important factors as the applicant's resume, written application, history of performance at the Department, and references. Basing a promotion decision solely on how an applicant answers questions at an interview, or what an applicant says during that interview about his or her prior performance or abilities, without considering other readily available information and without asking the applicant's prior supervisors how the applicant has in fact performed, is at least curious.

■■ The Department of course is free to adopt any approach it chooses, rational or irrational, so long as race (or any other prohibited characteristic) is not a factor. *See, e.g., Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997). The Department need not take into account prior job performance, ability demonstrated throughout a career rather than in a single brief interview, or references. But when the system on its face makes this little sense, there is at least some risk that the proffered system is pretextual.[4] I find that this system was in fact pretextual.

Second, there were inconsistencies in the Department's allegedly fixed and consistent procedures, and, more importantly, some applicants received favored treatment. Thus, for example, the Department asserts applicants never received advance notice of the interview questions, which were sometimes long and complex and in some respects constituted in effect an oral examination. There was evidence, however, and I find, that at least one of the successful applicants did receive an advance copy of the questions.[5]

4. The Department's own counsel noted in closing argument to the jury that some people "freeze up" and do not interview well, even if well qualified for the position at issue. Far from exonerating the Department from the charge of discrimination, this simply confirms that basing a promotion decision *solely* on interviews may not result in the hiring of the best qualified applicant.

5. Department employee Christine Bethea saw a copy of the interview questions for one of the 1993 positions in the possession of Betty Thames, an SRN Supervisor, prior to the interviews. Ms. Thames told Ms. Bethea she had received the copy from Zilla Thompson, who later received the highest interview ratings and got the job. Ms. Bethea's testimony regarding what Ms. Thames said was admissible under Federal Rule

Given the nature of the questions and the determinative effect of the interviews, this provided an enormous advantage to the favored applicant—enough to determine the outcome.[6]

Third, the Department's allegedly precise and objective system was subject to easy manipulation and was in fact manipulated. For the 1991 position, for example, successful applicant Ted R. Dunaway received an aggregate interview score of 1466 while the unsuccessful applicants received scores of 1230 (Gwendolyn Cook), 1182 (Zilla Thompson) and 1145 (Ms. Peoples). Despite this seeming precision—scores calculated to four significant digits—in truth these were simply the sums of totally subjective ratings assigned by the members of a handpicked selection committee. No African American nurse sat on any of these selection committees. And there was direct testimony that at least one member of one of the selection committees at issue (Judy Wester) told another Department employee who was on a selection committee for a different position (Dyron Williams) that she should simply rate the applicant she most liked higher than the others without regard to the actual questions or answers. In short, I find that the numbers were allegedly precise but in fact virtually meaningless.

Fourth, in at least some instances, the Department preselected the person it intended to promote and went through the application and interview process simply as a charade. Thus, for example, at the time of the 1993 opening for which William Dickson ultimately was selected, Gwendolyn Cook was the Executive Nursing Director with line authority over the open position. Two witnesses heard Ms. Cook say, before applications were even submitted, that if Mr. Dickson applied, she would give him the position. Although Ms. Cook denied making the statement, the jury was free to credit the testimony that she did make the statement. I find that some applicants were preselected or at least so heavily favored at the outset that their selection in the Department's subjective and manipulable process was virtually certain.[7]

Fifth, the Department sometimes did not follow its prescribed methodology at all. Thus, for example, when the position of Executive Nursing Director was open in late 1992 or early 1993, Ms. Cook did not receive the highest rating on her interview and thus, under the Department's system, would not have gotten the job. Apparently dissatisfied with that outcome, the Department chose not to use the interview scores as the basis for selection, but instead to use the sum of each applicant's scores on his or her written application plus the applicant's scores on his or her interview. Using this method, Ms. Cook received the highest rating and was chosen for the position.

Similarly, when Ms. Peoples applied for a different opening in 1994 (not one at issue in the case at bar), she did not receive the highest interview rating but nonetheless got the job, perhaps in an effort to head off this lawsuit. Whatever the reason, the selection of Ms. Peoples, like the selection of Ms. Cook for the Executive Nursing Director position,

---

of Evidence 801(d)(2)(D), and I find both Ms. Bethea's testimony on this and Ms. Thames' statement to Ms. Bethea to be true. I do not credit Ms. Thames' testimony at trial that she did not make the statement.

6. In addition, the Department asserts that the questions were read orally to the applicant during the interview but that the applicant did not receive a written copy of the questions for reference while answering. The Department's own witnesses gave contradictory testimony on this, however, with some saying applicants did receive written copies of the questions during the interviews and some saying they did not. The inescapable conclusion is that there were inconsistencies in the Department's procedures. Because some of the questions were long and complex or technical, this could have had a sig-

nificant effect on an applicant's performance at the interview.

7. Further evidence of this comes from the testimony of Department Nursing Consultant Alva Martin. She developed or helped develop the KSAs and served on the selection committee for each of the positions at issue. With respect to the 1992 position ultimately awarded to Ms. Cook, Ms. Martin assigned Ms. Cook the highest rating, but she assigned Ms. Peoples a higher rating than Ms. Thompson. With respect to the 1993 position for which Ms. Thompson was selected, however, Ms. Martin rated Ms. Thompson higher than Ms. Peoples. A reasonable inference is that Ms. Martin rated Ms. Peoples higher than Ms. Thompson except when the result of doing so might be that Ms. Peoples might actually get the job.

made clear that the Department's allegedly objective rating system was not in fact determinative.

Finally, the Department's history of promoting black nurses to supervisory positions at Florida State Hospital is not good. The record includes incomplete statistical information, in part apparently because of the manner in which the Department has maintained its statistics. This much, however, is clear: with the exception of a single unit (Unit 14) that is monitored for equal opportunity compliance by the federal government, African American nurses are substantially under-represented in the SRN Supervisor positions at Florida State Hospital.

Thus, for example, as of December 1996, there were a total of seven African American SRN Supervisors, five in Unit 14. Excluding Unit 14, only two of the 17 SRN Supervisors, or less than 12%, were African American. This was markedly below the percentage of Registered Nurses who were African American.

The situation was apparently no better, and perhaps worse, during the years at issue in the case at bar. In 1991, 1992 and 1993, there were eight SRN Supervisors who were African American, out of a total of between 36 and 38 total SRN Supervisors. Although the record apparently does not indicate how many of the African American SRN Supervisors were in Unit 14, the low turnover among those positions makes it reasonable to infer that at least five were. Thus there were no more than two or three African American SRN Supervisors in the remainder of the hospital. The percentage of African American SRN Supervisors outside Unit 14 was again well below the overall percentage of African American Registered Nurses.

Two additional facts make this particularly significant. First, it is clear that, when the Department is subjected to meaningful monitoring of its practices, the situation is markedly different; in Unit 14, which is subject to federal monitoring, the percentage of African American SRN Supervisors is much higher.[8] Second, as of 1992, of all the Registered Nurses at Florida State Hospital holding Bachelor of Science degrees in nursing (as opposed to lesser nursing degrees) 38% were African American. While one would not expect Bachelor of Science degrees to correlate perfectly with promotions to supervisory positions, one also would not expect an inverse correlation.[9]

In sum, I find that the Department's supposedly objective and race-neutral methodology was neither. The system was a sham designed to afford a cover story for what was in fact a subjective and unexplained method of filling positions. A finding of pretext is itself a sufficient basis from which a finder of fact can infer racial motivation, and I choose to draw that inference. Moreover, even in the absence of the rule allowing discrimination to be inferred from pretext, I would and do find as a fact, based on the greater weight of the evidence, that the Department was motivated in part by race in filling the positions at issue.

### Finding: Ms. Peoples Would Not Have Been Promoted, Even in the Absence of Racial Discrimination

 The finding of racial motivation does not, however, end the matter. The Department asserts it would not have promoted Ms. Peoples anyway, even in the absence of racial discrimination. The jury so found with respect to the 1993 promotions, and there was sufficient evidence from which the jury reasonably could so find. I am bound by that finding. As the finder of fact, I conclude that the same is true of the 1991 and 1992 promotions.

---

8. At trial, the Department confidently presented its overall statistics, showing a commendable percentage of African American SRN Supervisors for all units combined. It was immediately obvious from the statistics the Department introduced (see Defendant's Exhibit 10D) that the African American SRN Supervisors were clustered in Unit 14. When I asked the Department's Nursing Consultant Ms. Martin why this was the case, she immediately gave one explanation: in effect, because the federal government required non-discriminatory hiring in that unit.

9. Similarly, roughly 45% of all African American Registered Nurses at Florida State Hospital had Bachelor of Science degrees, whereas only about 19% of white Registered Nurses at Florida State Hospital had such degrees. Yet whites received promotions to supervisory positions more readily than African Americans.

Ms. Peoples is an able, conscientious and dedicated nurse. She has served as supervisor to various employees in the past and has done so successfully. There is no doubt she is qualified for the position of Senior Registered Nurse Supervisor. But having observed the witnesses and reviewed the record in detail, comparing the applications for each of the positions, I conclude from the greater weight of the evidence that Ms. Peoples would not have been the successful applicant for these positions anyway, even had race not been a factor.

Thus, for example, there were six applicants for the 1991 position. Five—all except Ms. Peoples—had served as a Registered Nurse Supervisor at Florida State Hospital or elsewhere. Four of those five, like Ms. Peoples, had Bachelor of Science degrees. Ms. Peoples was well qualified, but it is more likely than not that one of the other five, not Ms. Peoples, would have gotten the job had race not been taken into account.

Similarly, there were 14 applicants for the 1992 position. Many of the applicants had Bachelor of Science degrees in nursing. Many had experience as Registered Nurse Supervisors and were already serving in that capacity at the time. The successful applicant, Ms. Cook, had a Bachelor of Science degree and approximately eight years experience in two different Registered Nurse Supervisor positions. She testified at trial and was quite impressive. It is likely she would have received the position ahead of Ms. Peoples even in the absence of racial discrimination. In any event, I find it more likely than not that one of the other 13 applicants, not Ms. Peoples, would have received the position, even had race played no part in the Department's decision.

### The Legal Effect of These Findings

The Department's consideration of race as a motivating factor in filling the four positions at issue violated both the Fourteenth Amendment and Title VII. That without more does not necessarily mean, however, that Ms. Peoples is entitled to relief in this action.

It is a complete defense to an action under § 1983 that a defendant employer would have reached the same decision anyway, even in the absence of racial discrimination. *See, e.g., Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1084–85 n. 5 (11th Cir.1996); *Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1062 (11th Cir.1994).[10] Judgment therefore will be entered in favor of the Department against Ms. Peoples with respect to her claims under § 1983.

Under Title VII, however, the result is different. Congress amended the statute in 1991 to address precisely this situation.

It is a violation of 42 U.S.C. § 2000e–2(m), part of Title VII, for an employer to consider race as a motivating factor in connection with any employment practice, including a promotion. The 1991 amendment addresses the availability of relief to a plaintiff who, like Ms. Peoples, establishes a violation of § 2000e–2(m) but who, also like Ms. Peoples, would not have received the benefit at issue anyway, even in the absence of discrimination. The amendment provides:

On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court -

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and

(ii) shall not award damages or issue an order requiring any admission, reinstate-

---

**10.** Ms. Peoples asserts that the "same decision" for purposes of this rule is the decision to promote the same person. Thus, Ms. Peoples says, if the Department proves it would not have promoted Ms. Peoples anyway, even if race had not been taken into account, that is insufficient to constitute a defense; Ms. Peoples says the Department must establish it would have promoted the same person. I disagree. From Ms. Peoples' perspective, what matters is whether she would have received the promotion or not; if she would not have received the job, it makes no difference which of the other applicants would have succeeded. In short, if Ms. Peoples would not herself have received the job, she has not established the effect on herself that is a prerequisite to relief under § 1983.

ment, hiring, promotion, or payment [to the plaintiff].

*Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1084–85 n. 5 (11th Cir.1996), *quoting* 42 U.S.C. § 2000e–5(g)(2)(B) (1995).

Ms. Peoples thus is not foreclosed from all relief under Title VII. The court cannot order her promoted to the positions she sought nor award her back pay or damages. The court may, however, provide other declaratory or injunctive relief.

I conclude, as a matter of discretion, that such relief should be awarded here. Ms. Peoples remains a Senior Registered Nurse at Florida State Hospital. She presumably will be an applicant for future SRN Supervisor openings. She has a real and substantial stake in the discontinuation of the Department's unlawful practices. Thus she not only had standing to litigate her claims for back pay, damages and an injunction requiring the Department to promote her; she also has standing to seek, and a very substantial personal interest in, more general injunctive relief that would afford her a level playing field for future applications. Such relief will be granted.

### Conclusion

The Department improperly considered race as a motivating factor in denying Ms. Peoples each of the four promotions at issue. But the Department would not have promoted Ms. Peoples anyway, even in the absence of racial discrimination. Ms. Peoples therefore cannot recover under 42 U.S.C. § 1983 and can recover only limited relief under Title VII of the Civil Rights Act of 1964, as amended. Accordingly,

IT IS ORDERED:

1. Plaintiff Shilda Peoples shall recover declaratory and injunctive relief from defendant State of Florida Department of Children and Families under Title VII of the Civil Rights Act of 1964, as amended, with respect to her applications for two Senior Registered Nurse Supervisor positions in 1993. Ms. Peoples' remaining claims are dismissed with prejudice.

2. It is hereby DECLARED that defendant State of Florida Department of Children and Families violated Title VII of the Civil Rights Act of 1964, as amended, by considering race as a motivating factor in connection with its denial of plaintiff Shilda Peoples' application for Senior Registered Nurse Supervisor Position No. 09671 (awarded February 2, 1993) and Senior Registered Nurse Supervisor Position No. 46392 (awarded February 24, 1993).

3. The defendant State of Florida Department of Children and Families is hereby ENJOINED from considering applications for promotions at the Florida State Hospital based solely on committee ratings of the performance of the highest rated applicants at oral interviews. This injunction is binding upon the Department, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise.

4. The defendant State of Florida Department of Children and Families shall consider applications for promotions at the Florida State Hospital without considering any African American's race as an adverse motivating factor, and is so enjoined. This injunction is binding upon the Department, its officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this injunction by personal service or otherwise.

5. The clerk shall enter judgment (1) in favor of plaintiff Shilda Peoples against the State of Florida Department of Children and Families for declaratory and injunctive relief tracking paragraphs 2 through 4 verbatim and (2) dismissing all further claims. The clerk shall close the file.

6. The court reserves jurisdiction to enforce the provisions of this order and to consider any motions for costs or attorney's fees. Any such motions should be filed within the time limits provided by the Local Rules.