*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARLON CARTER and All Others Similarly
Situated,

Plaintiffs-Appellants,

v

MICHIGAN STATE POLICE and DIRECTOR OF
THE DEPARTMENT OF STATE POLICE
COLONEL KRISTIE KIBBY ETUE,

Defendants-Appellees,

and

CIVIL SERVICE COMMISSION and STATE
PERSONNEL DIRECTOR,

Defendants.

UNPUBLISHED
July 16, 2020

No. 349368
Wayne Circuit Court
LC No. 15-015901-CZ

Before: TUKEL, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

Plaintiffs, Marlon Carter and all others similarly situated, appeal by leave granted[1] the trial court's order denying their motion for class certification. On appeal, plaintiffs argue that the trial court erred by concluding that plaintiffs failed to establish the commonality requirement for class certification in this class action against defendants, State Police and Colonel Kristie Kibby Etue,[2]

---

[1] *Carter v State Police*, unpublished order of the Court of Appeals, entered September 18, 2019 (Docket No. 349368).

[2] The trial court entered a stipulated order on May 29, 2019, dismissing defendants Civil Service Commission and State Personnel Director with prejudice.

-1-

and by improperly assessing the merits of the lawsuit in denying the motion. For the reasons stated below, we reverse the trial court's order and remand the matter for further proceedings.

## I. BACKGROUND

This appeal arises from a class action against defendants challenging an aspect of defendant Michigan State Police's ("MSP") selection process known as the "prescreening interview." Part of an extensive selection process conducted by MSP's Recruitment and Selection section, the prescreening interview is conducted after an applicant passes a preliminary examination, submits an online application and numerous personal documents, fills out a supplementary application and personal history questionnaire, passes a fitness test, and undergoes an orientation to the application process and an overview of what recruit school will entail. According to the description in MSP Official Order 58, the prescreening interview is not a hiring interview, but is used to "determine if the applicant meets the minimum standards to continue in the selection process."

During the prescreening interview, the applicant is asked a series of questions from a prepared questionnaire. Factors considered during the interview include prior drug use, criminal history, and credit history. For certain factors, such as credit history, academic performance, or maturity, are assessed subjectively, while other factors, such as drug use, are assessed both subjectively and objectively. Following the interview, the applicant is rated with a 1, 2, or 3. Applicants rated 3 meet the minimum qualifications to move forward in the selection process, those rated 2 do not meet the minimum qualifications and must wait two years to reapply, and those rated 1 do not meet the minimum qualifications and are permanently disqualified. Prior to 2014, the decision whether to give an applicant a 1, 2, or 3 on the prescreening interview was in the sole discretion of the two interviewers who conducted the interview. A new policy was put in place in 2014, whereby the decision to score an applicant with a 1 or 2 was made during "consensus meetings" of a group of four to five individuals. There were no guidelines for how decisions were made during the consensus meetings. In addition, the decision-making process of the consensus meetings was not documented.

The named plaintiff, Marlon Carter, is an African-American male who applied for a position with the MSP. After undergoing a prescreening interview on December 8, 2012, he received a rating of 2 based on a poor credit history and currently past-due bills.[3] According to internal documentation, Carter was "removed from the selection process until he is able to show a pattern of responsible financial behavior."

---

[3] First Lieutenant Robert Hendrix, in charge of recruitment and selection since 2014, testified at his deposition that an applicant might be given a score of 2 because of credit issues, but whether a particular applicant's financial history warrants a score of 2 is determined without the use of guidelines or criteria.

Carter filed a complaint on behalf of himself and others similarly situated on December 7, 2015, asserting one count of disparate impact[4] and two counts of intentional discrimination under the Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. Relative to the instant appeal, plaintiffs alleged that defendants "intentionally permitted management/command officers to implement subjective selection criteria for trooper applicants in a discriminatory manner based on highly subjective criteria, and without specific training in equal employment opportunity practices or oversight[,]" and that "[s]uch subjective decision-making predictably and actually resulted in adverse impact on African[-]American trooper applicants." Plaintiffs further alleged that defendants failed to monitor the adverse impact of its hiring practices on African-American applicants.

On March 28, 2019, plaintiffs moved for certification of a class defined as "[a]ll African[-]American applicants for the position of Michigan State Trooper at any time on or after December 8, 2012 who received a score of '2' on the Pre-Screening Interview[.]" Plaintiffs asserted that they had properly met all of the criteria for class certification. Regarding commonality, the criterion at issue in this appeal, plaintiffs contended that the commonality requirement for class certification was satisfied for their class action because the use of subjective criteria in the prescreening interview applied to all class members. Anticipating defendants' reliance on *Wal-Mart Stores, Inc v Dukes*, 564 US 338; 131 S Ct 2541; 180 L Ed 2d 374 (2011), plaintiffs distinguished *Wal-Mart* by asserting that the present case, unlike *Wal-Mart*, "involves a small group of common decision-makers, following the same organization-wide evaluation method regarding the subjective criteria used in the Pre-Screening Interview."

In their opposition to plaintiffs' motion, defendants argued that plaintiffs failed to establish the commonality, typicality, and adequacy requirements for class certification. They argued that plaintiffs failed to satisfy commonality under *Wal-Mart* because they failed to establish " 'significant proof' that MSP has a general policy of discrimination." Defendants attacked the substance of the findings of plaintiffs' expert and argued that individualized proofs would be required for each class member.

Subsequent to a hearing on plaintiffs' motion for class certification, the trial court issued an order and written opinion denying the motion. Focusing only on the commonality requirement, the trial court found that plaintiff had "not presented significant proof of a general policy of discrimination" or "shown that the MSP maintained a common mode of exercising discretion that pervaded the entire department." The court found plaintiffs' expert's analysis "unavailing," observing that his analysis showed only "a statistically significant difference between minority and non-minority applicants in terms of the proportion selected within the time period" but failed to control for differences in the backgrounds of individual applicants. The court deemed such differences "critical, because if the groups have various factors in their backgrounds related not only to their finances but also to their personal histories, including, for example, their criminal

---

[4] Plaintiffs also alleged that the written examinations administered by the Civil Service Commission had a disparate impact on African-American applicants. Carter passed the examination and, as previously indicated, the Civil Service Commission and its personnel director were dismissed from this case.

histories, along with their prior drug use, a finding of different selection score outcomes would be appropriate and would not support a conclusion of disparate impact." In other words, nondiscriminatory factors "could likely have contributed to the disparity . . . ." The court stated in its penultimate paragraph:

> Given the highly individualized claims and defenses in this employment discrimination case, which arise out of the various backgrounds of putative class members over a significant time period, the Court finds that individualized proofs would necessarily predominate over generalized proofs, and therefore, that the proposed claim does not meet the commonality requirement. As a result, Plaintiff has failed to demonstrate that class certification is warranted.

As noted above, plaintiffs filed an application for leave to appeal the trial court's decision with this Court, which we granted. *Carter v State Police*, unpublished order of the Court of Appeals, entered September 18, 2019 (Docket No. 349638).

## II. STANDARD OF REVIEW

In the context of a decision on class certification, we review a trial court's factual findings for clear error and its decision regarding certification for abuse of discretion. *Henry v Dow Chem Co*, 484 Mich 483, 495-496; 772 NW2d 301 (2009). Under the clear error standard, this Court "will overturn the trial court's decision only if we are left with the definite and firm conviction that a mistake has been made." *Adams v West Ottawa Pub Sch*, 277 Mich App 461, 465; 746 NW2d 113 (2008). "The trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes." *Heaton v Benton Constr Co*, 286 Mich App 528, 542; 780 NW2d 618 (2009). "The proper interpretation and application of a court rule is a question of law, which we review de novo." *Henry*, 484 Mich at 495.

## III. DISCUSSION

Plaintiffs first argue that the trial court abused its discretion when it denied their motion for class certification on the ground that they had not satisfied the commonality requirement. We agree.

MCR 3.501(A)(1) allows a suit to proceed as a class-action suit only if all of the following requirements are met:

(a) the class is so numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;

(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(d) the representative parties will fairly and adequately assert and protect the interests of the class; and

(e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

These requirements are generally referred to as numerosity, commonality, typicality, adequacy, and superiority. *Henry*, 484 Mich at 488. The trial court may not "simply 'rubber stamp' a party's allegations that the class certification prerequisites are met." *Henry*, 484 Mich at 502. "[S]trict adherence to the class certification requirements is required." *Id*. at 500. "A party seeking class certification must meet the burden of establishing each prerequisite before a suit may proceed as a class action." *Id*. This is accomplished by "provid[ing] the certifying court with information sufficient to establish that each prerequisite for class certification in MCR 3.501(A)(1) is in fact satisfied." *Id*. at 502. "Because there is limited case law in Michigan addressing class certifications, this Court may refer to federal cases construing the federal rules on class certification." *Neal v James*, 252 Mich App 12, 15; 651 NW2d 181 (2002), overruled on other grounds by *Henry*, 484 Mich 483 (2009). While this Court may look to federal court decisions as persuasive authority, such decisions are not binding on this Court. See *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004) ("Although lower federal court decisions may be persuasive, they are not binding on state courts.").

"To establish commonality, the proponent of certification must establish that issues of fact and law common to the class predominate over those issues subject only to individualized proof." *Duskin v Dep't of Human Servs*, 304 Mich App 645, 654; 848 NW2d 455 (2014) (quotation marks and citation omitted). "The common contention . . . must be of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. (quotation marks and citation omitted). Commonality "does not require all issues in the litigation to be common . . . ." *Hill v Warren (On Remand)*, 276 Mich App 299, 311; 740 NW2d 706 (2007).

Defendants rely on *Wal-Mart Stores, Inc v Dukes*, 564 US 338 (2011), to contend that plaintiffs have not satisfied the requirement of commonality, while plaintiffs rely on it to argue that they have. In *Wal-Mart*, the named plaintiffs brought a class action against Wal-Mart on behalf of themselves and approximately 1.5 million current or former female employees, alleging that the company "discriminated against them on the basis of their sex by denying them equal pay or promotions." *Wal-Mart*, 564 US at 343; 131 S Ct 2541. The federal district court certified the plaintiffs' class, and the Ninth Circuit Court of Appeals affirmed that decision. *Id*., at 346; 131 S Ct 2541, 2549 (quotation marks and citations omitted). At issue before the Supreme Court was whether the class satisfied the criterion of commonality under the federal rules, which required the plaintiffs to show that "there are questions of law or fact common to the class." *Id*. at 349; 131 S Ct 2541. More specifically, the plaintiffs had to show a common contention "of such a nature that it is capable of class[-]wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350; 131 S Ct 2541.

The High Court concluded that the plaintiffs did not satisfy the commonality requirement under the federal rules because there was no common contention that tied their discrimination claims together. The evidence showed that the company left pay and promotion decisions to the broad discretion of local store managers, who exercised their discretion "in a largely subjective manner." *Id*. at 343; 131 S Ct 2541 (citation omitted). The Supreme Court explained that "[i]n a

company of Wal-Mart's size and geographical scope, it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." *Id*. To overcome this, a plaintiff would need to show "[s]ignificant proof that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring . . . practices in the same general fashion, such as through entirely subjective decisionmaking process." *Id*. at 353 (quotation marks and citation omitted). However, the plaintiffs had failed to present such proof. *Id*. at 354; 131 S Ct 2541. The Court explained:

> The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's "policy" of allowing discretion by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices. It is also a very common and presumptively reasonable way of doing business—one that we have said "should itself raise no inference of discriminatory conduct," *Watson v Fort Worth Bank & Trust*, 487 US 977, 990; 108 S Ct 2777, 101 L Ed 2d 827 (1988). [*Id*. at 355; 131 S Ct 2541.]

Because the discrimination alleged in *Wal-Mart* resulted from the exercise of discretion by hundreds of thousands of local store managers, made without any common policy or guidance from the company—i.e., without any "glue" to hold them together—the Supreme Court concluded that the plaintiffs had not established the existence of a common question. *Id*. at 359.

The present defendants contend that, like the plaintiffs in *Wal-Mart*, plaintiffs here have not presented significant proof of a general policy of discrimination. Defendants posit that there is no "glue" holding together MSP's alleged reasons for its employment decisions, and because "the claims, defenses[,] and substantive law applicable to this employment discrimination case will require particularized proof[,]" the trial court did not abuse its discretion by denying plaintiffs' motion for class certification. Contrariwise, plaintiffs rely on the Supreme Court's observation in *Wal-Mart* that the Court has "recognized that, 'in appropriate cases,' giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory—since 'an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Wal-Mart*, 564 US at 355; 131 S Ct 2541, quoting *Watson*, 487 US at 990; 108 S Ct 2777. Plaintiffs argued that theirs is just such a case.

In support of their position, plaintiffs rely on *McReynolds v Merrill Lynch, Pierce, Fenner & Smith, Inc*, 672 F3d 482 (CA 7, 2012), abrogated on other grounds as recognized by *Phillips v Sheriff of Cook Co*, 828 F 3d 541 (CA 7, 2018). The relevant issue in *McReynolds* was whether a class of 700 African-American brokers who accused Merrill Lynch of discrimination could be certified under federal rules. *McReynolds*, 672 F3d at 488. The federal district court denied the motion. A month later, the Supreme Court's decision in *Wal-Mart* was handed down and the plaintiffs renewed their motion for certification. *Id*. at 487. The federal district court again denied their motion, thinking the case like *Wal-Mart* because Merrill Lynch

> delegates discretion over decisions that influence the compensation of all the company's 15,000 brokers . . . to 135 "Complex Directors." Each of the Complex

Directors supervises several of the company's 600 branch offices, and within each branch office the brokers exercise a good deal of autonomy, though only within a framework established by the company. [*Id*. at 488.]

Two elements of that framework were at issue: Merrill Lynch's "teaming policy" and its "account distribution policy." *Id*. The teaming policy allows—but does not require—brokers in the same office to form teams for the purpose of sharing clients in order to increase the number of clients, client investments, and revenue. The brokers form the teams and, once a team is formed, decide whom to admit as a new member. Account distributions occur when a Merrill Lynch broker leaves the company and his or her clients' accounts must be transferred to other brokers. *Id*. "Accounts are transferred within a branch office, and the brokers in that office compete for the accounts. The company establishes criteria for deciding who will win the competition. The criteria include the competing brokers' records of revenue generated for the company and of the number and investments of clients retained." *Id*. at 488-489. Local branch managers and Complex Directors have the discretion to veto teams and "supplement the company criteria for distributions[,]" but exercised their discretion in support of the two company policies at issue. *Id*. at 489.

The plaintiffs asserted that Merrill Lynch's teaming policy exacerbated racial discrimination by the brokers. The Seventh Circuit recognized that brokers formed teams in a way that maximized their chance for success, but also observed, "[t]here is bound to be uncertainty about who will be effective in bringing and keeping shared clients; and when there is uncertainty people tend to base decisions on emotions and preconceptions, for want of objective criteria." *Id*. To illustrate its point, the federal appeals court provided the following, useful hypothetical:

> Suppose a police department authorizes each police officer to select an officer junior to him to be his partner. And suppose it turns out that male police officers never select female officers as their partners and white officers never select black officers as their partners. There would be no intentional discrimination at the departmental level, but the practice of allowing police officers to choose their partners could be challenged as enabling sexual and racial discrimination—as having in the jargon of discrimination law a "disparate impact" on a protected group—and if a discriminatory effect was proved, then to avoid an adverse judgment the department would have to prove that the policy was essential to the department's mission. That case would not be controlled by *Wal-Mart* (although there is an undoubted resemblance), in which employment decisions were delegated to local managers; it would be an employment decision by top management. [*Id*. (citations omitted).]

The federal appeals court observed that, just as in its hypothetical, where police officers selected their own partners as allowed by their department's policy, so also at Merrill Lynch, brokers formed teams as allowed by the policy framework that Merrill Lynch established. The federal appeals court concluded, "[i]f the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as 'disparate impact' employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination." *Id*.

Also instructive is *Ellis v Costco Wholesale Corp*, 285 FRD 492 (ND Cal, 2012), which follows the reasoning of *McReynolds* in distinguishing the claims of the plaintiffs alleging discrimination from those alleging discrimination in *Wal-Mart*. At issue in *Ellis* was certification of a class of plaintiffs who alleged that Costco's "tap-on-the-shoulder" method of promoting employees to General Manager and Assistant General Manager discriminated against women. At first glance, there did not seem to be a common contention that would provide the "glue" to the plaintiffs' allegations. There were no written policies explaining to employees the criteria for promotion to these two positions, no written guidelines explaining how to get on the list of promotable candidates, no posting of openings for these positions, no requirement that more than one candidate be considered for an open position, no requirement that performance evaluations or other documents be considered in the selection process, no consistent practice of interviewing potential candidates, and no records kept of the selection process. *Ellis*, 285 FRD at 498. Nevertheless, the federal district court found the "glue" that *Wal-Mart* was lacking in company-wide substantive criteria and procedural ground rules guided and supervised by a "relatively small and coherent group of company executives." In other words, although the selection criteria for these two positions was discretionary, discretion was exercised within a framework established and controlled by company executives, thus resulting in a common mode of exercising discretion that, according to the plaintiffs' statistical evidence, discriminated against women. *Id*. at 530. Accordingly, the federal district court found commonality satisfied under the federal rules for class action. *Id*. at 533.

Plaintiffs in the present case allege that the framework established by the MSP, i.e., allowing a prescreening interview in which the interviewers have the discretion to give applicants a ranking of 2 based on subjective criteria, has a disparate impact on African-American candidates. This case is not like *Wal-Mart*, where guidance from the company on pay and promotion decisions was lacking, and store managers were left to the exercise of their discretion, resulting in hundreds of thousands of store managers across the country making individual decisions that were allegedly discriminatory but not held together by any common content or common mode of decision-making. Here, as defendants point out, there is a rigorous selection process, of which the prescreening interview is one part, and which itself is subject to some guidance through the use of prepared questions. Thus, this case is more like *McReynolds*, wherein Merrill Lynch established facially neutral policies that it left to its brokers to execute, and the brokers then executed the policies in ways that the *McReynolds* plaintiffs claimed disparately impacted African-Americans. That the decision whether to give a 2 ranking to an applicant based on subjective criteria was made by the two interviewers and, after 2014, by a small group led by First Lieutenant Robert Hendrix, the officer in charge of recruitment and selection, arguably resembles *Ellis*, wherein the evidence showed that Costco had a subjective selection process established and supervised by a small, coherent group of decisionmakers, which resulted in a common mode of exercising discretion.

We conclude that whether the framework of the prescreening interview, which allows discretionary ranking based on subjective criteria, discriminates on the basis of race and is not justified by business necessity are questions common to the entire class and appropriate for class-wide determination. Whether plaintiffs can prevail on their claim is not at issue here, and the trial court's observation that there likely were nondiscriminatory reasons for the results of the expert's analysis, was tantamount to questioning the actual merits of the case, a violation of the "well-accepted prohibition against assessing the merits of a party's underlying claims at this early stage

in the proceedings." *Henry*, 484 Mich at 503. Therefore, we reverse the trial court's order denying plaintiffs' motion for class certification, and remand for the trial court to consider whether plaintiffs have established typicality and adequacy, the other class-certification requirements defendants challenge.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Deborah A. Servitto
/s/ Jane M. Beckering